**PRIMARY STEEL, INC. et al., Plaintiffs,**

v.

**UNITED STATES, Defendant,**

**and**

**Allied Tube & Conduit Corp., Defendant–Intervenor.**

No. 91–12–00879.

United States Court of International Trade.

Oct. 6, 1993.

---

**1376**

Sharretts, Paley, Carter & Blauvelt, P.C., Michael H. Greenberg and Duncan A. Nixon, Washington, DC, for plaintiff Primary Steel, Inc.

Katten Muchin Zavis & Dombroff, James M. Lyons and Robert F. Seely, Washington, DC, for plaintiffs Ad Hoc Coalition of Pipe Importers and Sunbelt Trading Co.

Barnes, Richardson & Colburn, Matthew T. McGrath and Ronald A. Oleynik and Holland & Knight, David H. Baker, Washington, DC, for plaintiff Intrepid, Inc.

Rogers & Wells, Ryan T. Trainer, Washington, DC, for plaintiff Port Everglades Steel Corp.

Frank W. Hunger, Asst. Atty. Gen. of U.S.; David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Marc E. Montalbine; Patrick V. Gallagher, Jr., Attorney, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, DC, of counsel, for defendant.

Schagrin Associates, Roger B. Schagrin, Mark C. Del Bianco, and Gail S. Usher, Washington, DC, for defendant-intervenor.

**OPINION**

CARMAN, Judge:

Plaintiffs bring this consolidated action pursuant to 19 U.S.C. § 1516a(2)(B)(iii) (1988) to contest the final determination by the International Trade Administration (ITA) in the 1987–1988 administrative review of the antidumping duty order issued in *Circular Welded Carbon Steel Pipes and Tubes from Thailand,* 51 Fed.Reg. 8341 (Dep't Comm. 1986) (antidumping duty order) (*Antidumping Order*). *See Certain Circular Welded Carbon Steel Pipes and Tubes from Thailand,* 56 Fed.Reg. 58,355 (Dep't Comm.1991) (final admin. rev.) (*Final Review*). Plaintiffs seek judgment pursuant to USCIT R. 56.1. This Court has jurisdiction under 28 U.S.C. § 1581(c) (1988) and, for the reasons which follow, enters judgment for defendant.

## I.  Background

The administrative review at issue in this case arises from the ITA's final determination in *Circular Welded Carbon Steel Pipes and Tubes from Thailand,* 51 Fed.Reg. 3384 (Dep't Comm.1986) (final determ.) (*Final Determination*). In the *Final Determination,* the ITA found various importers were selling or were likely to sell circular welded carbon steel pipes and tubes (standard pipe) from Thailand in the United States at less than fair value (LTFV). 51 Fed.Reg. at 3384. With respect to the importers covered by the investigation, the ITA determined the following weighted-average dumping margins: 15.69 percent for Saha Thai Steel Pipe Co., Ltd. (Saha Thai); 15.60 percent for Thai Steel Pipe Industry Company (Thai Steel); and, 15.67 percent for all others. *Id.* at 3387. The International Trade Commission later found the imports at issue were materially injuring a United States industry. *Antidumping Order,* 51 Fed.Reg. at 8341. Based on the LTFV and injury findings, the ITA issued an antidumping duty order incorporating the weighted-average antidumping duty margins set forth in the *Final Determination. Id.* at 8341–42.

The ITA subsequently undertook an administrative review of imports of standard

pipe into the United States between March 1, 1987 and February 29, 1988. *Certain Circular Welded Carbon Steel Pipes and Tubes From Thailand,* 55 Fed.Reg. 42,596 (Dep't Comm.1990) (prelim. admin. review) (*Preliminary Review*). This review covered four manufacturers of Thai standard pipe: (1) Saha Thai; (2) Siam Steel Pipe Import–Export Co., Ltd. (Siam Steel); (3) Thai Hong Steel Pipe Co., Ltd. (Thai Hong); and, (4) Thai Union Steel Co., Ltd. (Thai Union). *Id.* In the course of its review, the ITA sent the manufacturers questionnaires seeking information pertaining to their United States sales, shipping expenses, and customers in the Thai home market and, when relevant, in third country markets. The ITA also sent cost of production (COP) questionnaires to Saha Thai, Thai Hong, and Thai Union.

The ITA later conducted verification of the questionnaire responses supplied by Saha Thai, Thai Hong, and Thai Union. The ITA did not attempt to verify Siam Steel's response because "significant portions of its response were not verifiable." *Id.* In addition, the ITA "found that significant portions of Thai Hong's response did not verify or were unverifiable." *Id.* Because of the deficiencies in Siam Steel's and Thai Hong's responses, the ITA used the best information available (BIA) pursuant to 19 U.S.C. § 1677e(c) (1988) in calculating the companies' dumping margins in the *Preliminary Review. Id.* The margins found in the *Preliminary Review* were .48 percent for Saha Thai and 75.06 percent for Siam Steel, Thai Hong, and Thai Union. *Id.* at 42,597.

On November 19, 1991, the ITA published the final results of its administrative review. *See Final Review,* 56 Fed.Reg. at 58,355. The margins found in the *Final Review* differed substantially from those determined in the *Preliminary Review.* The margins calculated in the *Final Review* were .49 percent for Saha Thai and 38.51 percent for Siam Steel, Thai Hong, Thai Union, and all other manufacturers. *Id.* at 58,361. The changed margins arose from the ITA's analysis of comments from interested parties pertaining to the *Preliminary Review. Id.* at 58,355. The instant action only challenges the ITA's findings in the *Final Review* concerning Thai Union.

Several aspects of the *Final Review* are pertinent to the instant case. The first is the ITA's assessment of Thai Union's COP for galvanized and coupled pipe. *See id.* at 58,-357. The ITA found Thai Union's COP calculations "seriously understate[d] the quantity of zinc actually [used] on [galvanized and coupled pipe] and [did] not include the cost of couplings." *Id.* The ITA also determined petitioners' COP calculation for galvanized and coupled pipe, which incorporated information that Thai Union had submitted at various times, was "the best information currently available on the record." *Id.* As a result, the ITA used petitioners' calculation instead of that offered by Thai Union in making its findings. *Id.* The calculation adopted by the ITA assessed "(1) the per-ton cost of zinc coating based upon the respective quantities of zinc purchased and pipe produced in 1987, and (2) the cost of couplings based on average coupling cost and the quantity of couplings consumed per ton of [galvanized] pipe produced." *Id.*

The second pertinent aspect of the *Final Review* is the ITA's analysis of the credit expenses Thai Union incurred in its United States sales. The ITA concluded the credit expense information Thai Union submitted was deficient as it merely approximated Thai Union's company-specific rate by using "the ratio of Thai Union's interest payments in 1987 over the company's total debt outstanding in that year." *Id.* at 58,358. The ITA found Thai Union's methodology to be "inappropriate for calculating an interest rate on short-term debt because it ignores the fact that total debt includes both long-term and short-term debt, and does not take into account such factors as grace periods or balloon payments which may also exist." *Id.* As a result, the ITA used the International Monetary Fund's (IMF) country-wide lending rate—the maximum rate charged by commercial banks for short-term export-related loans—as BIA for determining Thai Union's short-term credit expenses. *Id.*

The other aspects of the *Final Review* relevant to the instant case are the ITA's treatment of duty drawback payments alleg-

edly received by Thai Union and of the company's below-cost, home market sales. *See id.*, 58,360–61. With respect to the duty drawback payments, the ITA was unable to verify the information submitted by Thai Union and therefore declined to make an upward adjustment in the company's United States price. *Id.* at 58,358. Similarly, the ITA chose to disregard Thai Union's below-cost, home market sales in assessing foreign market value because such sales caused the company to incur a large revenue shortfall and prevented the company from recovering all costs within a reasonable period of time in the normal course of trade. *Id.* at 58,361 (citing *Timken Co. v. United States,* 11 CIT 786, 808–09, 673 F.Supp. 495, 516 (1987)).

After the Court heard oral arguments in this case, the parties entered into a stipulation. *See* Parties' Stipulation of May 27, 1993. The stipulation affects several issues that are germane to the *Final Review* and necessitates a remand to the Department of Commerce. Accordingly, this opinion does not address the issues that Commerce will address on remand.

## II. CONTENTIONS OF THE PARTIES

### A. *Plaintiffs*

Plaintiffs challenge the *Final Review* on several grounds. First, plaintiffs argue the ITA incorrectly used extraordinarily high surrogate data as BIA in determining Thai Union's COP for galvanized threaded and coupled pipe. Though plaintiffs accept the ITA's decision to use BIA with respect to Thai Union's COP,[1] plaintiffs claim the ITA did not use the most accurate and relevant information available as BIA as required by 19 U.S.C. § 1677e(c). According to plaintiffs, in making its calculations the ITA improperly assumed Thai Union used the entire quantity of zinc the company had purchased in 1987 to manufacture galvanized pipe in 1987. Such a COP methodology, plaintiffs urge, increases Thai Union's per-unit cost of zinc by over 200 percent—an amount which far exceeds industry norms. Instead of the methodology selected by the ITA, plaintiffs

assert the ITA should have accounted for Thai Union's opening and closing zinc inventories. Alternatively, plaintiffs argue the ITA should have determined Thai Union's COP by using the zinc yield loss and COP verified for Saha Thai because Thai Union employs the same manufacturing process as Saha Thai, citing *Porcelain–On–Steel Cooking Ware From Taiwan,* 51 Fed.Reg. 36,425, 36,426–27 (Dep't Comm.1986) (final determ.).

Plaintiffs' second principal contention is that the ITA should not have used BIA in assessing Thai Union's credit costs on the company's United States sales. Pl.Primary's Br. at 16. Plaintiffs maintain Thai Union submitted sufficient evidence of its credit costs to enable the ITA to determine a company-specific rate for a credit cost adjustment without resorting to the higher, IMF country-wide lending rate that Commerce ultimately used, citing *Color Television Receivers from Korea,* 53 Fed.Reg. 24,975, 24,976–77 (Dep't Comm.1988) (final admin. review). *Id.* at 16. Plaintiffs also claim the ITA improperly refused to allow Thai Union to offset its actual interest income against the imputed IMF rate. *Id.*

Third, plaintiffs maintain the ITA erred in denying Thai Union an adjustment for duty drawback. *Id.* at 18. Although plaintiff Primary Steel admits Thai Union submitted its drawback records late, it contends the delay was insubstantial because the ITA received the information one year before the preliminary determination and two years before the final determination. Pl.Primary's Reply Br. at 13. Plaintiffs also emphasize the fact that in a related countervailing duty investigation Commerce found Thai Union received rebates of import taxes under the same program upon which the company based its request in the antidumping duty review for an adjustment to its United States price. Pl.Coalition's Br. at 33. Accordingly, plaintiffs argue the ITA had sufficient information before it to grant Thai Union a duty drawback adjustment. *Id.*

---

**1.** Plaintiffs admit Thai Union understated its COP for galvanized threaded and coupled pipe because the company did not account for the cost of couplings and the loss of zinc as dross and ash in the galvanizing process. Pl.Primary's Br. at 11.

Finally, plaintiff Intrepid asserts the ITA improperly disregarded certain below-cost, home market sales by Thai Union in assessing foreign market value. Pl.Intrepid's Br. at 10. Intrepid maintains the ITA failed to examine the applicable criteria set forth in 19 U.S.C. § 1677b(b) (1988), which indicate under what circumstances the ITA may disregard below-cost sales, citing *Timken*, 11 CIT at 804–05, 673 F.Supp. at 513, and *NTN Bearing Corp. of Am. v. United States*, 14 CIT 623, 747 F.Supp. 726 (1990). Intrepid appears to suggest that because Thai Union "fully recovered the cost of production within a reasonable period of time," the company's below-cost, home market sales did not meet § 1677b(b)'s criteria. As such, Intrepid urges the ITA could not properly disregard the sales when determining foreign market value.

## B. *Defendants*

The government and Allied Tube (defendants) advance four arguments to support the ITA's determination in the *Final Review*. First, defendants argue the ITA's selection of BIA with respect to Thai Union's COP was supported by substantial evidence. Govt.Br. at 11. Defendants emphasize Thai Union's reported COP figures for galvanized threaded and coupled pipe did not account for zinc lost as dust, ash, or dross. As a result, defendants contend the ITA properly selected as BIA the two variables most rationally related to Thai Union's use of zinc: (1) the amount of zinc purchased by Thai Union during 1987; and (2) the amount of galvanized pipe produced by Thai Union during 1987. *Id.* at 13. Defendants maintain that by dividing the first variable by the second, the ITA could accurately calculate Thai Union's average coupling cost and per-ton zinc cost. Def.–Int.'s Br. at 6–7. In addition, defendants assert the ITA reasonably decided to use as BIA information supplied by Thai Union rather than data based on the experience of other, unrelated manufacturers. Govt.'s Br. at 14. According to defendants, using figures supplied by other Thai manufacturers would encourage respondents only to provide information which was more beneficial than industry averages or provide no information where its costs were higher than industry norms. *Id.* at 14–15.

Defendants' second main contention is that the ITA correctly used the IMF's country-wide, short-term lending rate as BIA in imputing credit expenses on Thai Union's United States sales. Defendants claim the company-specific interest rate proposed by plaintiffs only approximates Thai Union's total monetary costs because the rate does not differentiate between long-term and short-term debt. Defendants also urge the company-specific rate does not include short-term debt or account for possible grace periods or balloon payments, citing *Final Review*, 56 Fed.Reg. at 58,358. Def.–Int.'s Br. at 11. Accordingly, defendants argue the ITA reasonably selected the IMF rate as BIA. Moreover, according to defendants, because plaintiffs did not demonstrate or claim Thai Union's interest income was related to the company's United States sales, the ITA properly refused to offset the IMF rate with the company's interest income. *Id.* at 13.

Third, defendants maintain the ITA correctly denied Thai Union's request for a duty drawback adjustment. In short, defendants argue the ITA's denial was proper because Thai Union could not substantiate its drawback claims at verification. Govt.'s Br. at 19.

Finally, defendants contend the ITA properly disregarded certain below-cost, home market sales by Thai Union in determining the company's foreign market value. Defendants assert the ITA analyzed all of the criteria set forth in 19 U.S.C. § 1677b(b) and conformed to this Court's decision in *Timken*, 11 CIT at 786, 673 F.Supp. at 495. *Id.* at 24. Defendants claim the record in this case contains ample evidence supporting the ITA's conclusion that Thai Union's below-cost, home market sales caused the company to incur a large revenue shortfall and prevented the company from recovering all costs within a reasonable period of time in the normal course of trade as required by 19 U.S.C. § 1677b(b). *Id.* at 26. Specifically, defendants point to Thai Union's extremely high proportion of below-cost sales at prices well below the company's COP and the absence of documentation demonstrating these sales enabled the company to either recover

its costs or earn a profit during the period under review. *Id.* at 26–27. Accordingly, defendants urge this Court to sustain the ITA's foreign market value determination.

### III. STANDARD OF REVIEW

In reviewing a determination made by Commerce, this Court must decide whether the determination is supported by substantial evidence on the record and is otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1988). "Substantial evidence is something more than a 'mere scintilla,' and must be enough reasonably to support a conclusion." *Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 405, 636 F.Supp. 961, 966 (1986), *aff'd,* 5 Fed. Cir.(T) 77, 810 F.2d 1137 (1987) (citations omitted).

This Court must also accord substantial weight to the agency's interpretation of the statute it administers. *American Lamb Co. v. United States,* 4 Fed.Cir.(T) 47, 54, 785 F.2d 994, 1001 (1986) (citations omitted). "An agency's 'interpretation of the statute need not be the *only* reasonable interpretation or the one which the court views as the most reasonable.'" *ICC Indus., Inc. v. United States,* 5 Fed.Cir.(T) 78, 85, 812 F.2d 694, 699 (1987) (emphasis in original) (citation omitted). Where "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (footnote omitted). The agency must not, however, "contravene or ignore the intent of the legislature or the guiding purpose of the statute." *Ceramica Regiomontana,* 10 CIT at 405, 636 F.Supp. at 966 (citations omitted).

### IV. DISCUSSION

#### A. *BIA*

The ITA's authority to use BIA in an administrative review of an antidumping duty order resides in 19 U.S.C. § 1677e(b) and 19 C.F.R. § 353.37 (1993). Section 1677e(b) indicates the following in pertinent part: "[i]f the administering authority is unable to verify the accuracy of information submitted, it shall use the best information available to it as the basis for its action. . . ." 19 C.F.R. § 353.37 reads as follows:

(a) *Use of best information available.* The Secretary will use the best information available whenever the Secretary:

(1) Does not receive a complete, accurate, and timely response to the Secretary's request for factual information; or

(2) Is unable to verify, within the time specified, the accuracy and completeness of the factual information submitted.

(b) *What is best information available.* The best information available may include the factual information submitted in support of the petition or subsequently submitted by interested parties. . . . If an interested party refuses to provide factual information requested by the Secretary or otherwise impedes the proceeding, the Secretary may take that into account in determining what is the best information available.

In sum, the ITA's "authority to select best information otherwise available is subject to a rational relationship between data chosen and the matter to which they are to apply." *Manifattura Emmepi S.p.A. v. United States,* 16 CIT ——, ——, 799 F.Supp. 110, 115 (1992).

#### 1. BIA Selected for Thai Union's Cost of Production

Plaintiffs challenge the ITA's use of BIA with respect to Thai Union's COP for galvanized and coupled pipe. As noted previously, the ITA found Thai Union's COP calculations "seriously understate[d] the quantity of zinc actually [used] on [galvanized and coupled pipe] and [did] not include the cost of couplings." *Final Review,* 56 Fed. Reg. at 58,357. Based on this finding, the ITA used as BIA the petitioners' COP calculation which assessed "(1) the per-ton cost of zinc coating based on the respective quantities of zinc purchased and pipe produced in 1987, and (2) the cost of couplings based on average coupling costs and the quantity of couplings consumed per ton of [galvanized] pipe produced." *Id.* The petitioners based

their calculation on previously verified information that Thai Union had submitted. Although plaintiffs concede the ITA properly resorted to BIA, they claim the ITA did not select the most accurate and relevant information as BIA. Plaintiffs assert the ITA should have accounted for Thai Union's opening and closing zinc inventories. Alternatively, plaintiffs argue the ITA should have determined Thai Union's COP by using the zinc yield loss and COP verified for Saha Thai because Thai Union employs the same manufacturing process as Saha Thai.

None of the arguments set forth by plaintiffs persuasively demonstrates the unreasonableness of Commerce's BIA selection. Plaintiffs have not indicated what evidence on the record, if any, demonstrates how Saha Thai's zinc yield loss and verified COP is probative of Thai Union's *own* zinc usage and coupling cost. The mere fact the two companies use the same manufacturing process is not probative of Thai Union's actual input costs and production output—two factors which directly relate to zinc usage and coupling cost. Nor have plaintiffs demonstrated how assessing Thai Union's opening and closing inventories produces a *more accurate* margin than the calculation employed by Commerce. Even assuming Commerce's choice of BIA produces a zinc cost in excess of industry norms, plaintiffs have not shown any record evidence indicating Thai Union's zinc cost do not exceed industry norms.

In short, "Commerce may exercise discretion in determining what is the best information available when an exporter or manufacturer has failed to supply requested information." *Chemical Prods. Corp. v. United States,* 10 CIT 626, 634, 645 F.Supp. 289, 295 (1986). Thai Union's failure to supply Commerce with the information necessary for determining the company's current zinc usage and couplings cost entitled Commerce to resort to the company's previously submitted information as BIA. *Cf. Rhone Poulenc, Inc. v. United States,* 8 Fed.Cir.(T) 61, 67, 899 F.2d 1185, 1190 (1990) (The BIA rule "reflects a common sense inference that the highest prior margin is the most probative evidence of current margins because, if it were not so, the importer, knowing of the rule, would have produced *current* information showing the margin to be less.") (emphasis in original). In addition, because the information upon which the calculation relies derives from Thai Union's previously verified purchase and sale experience, Commerce's decision to use the information was proper. *See* 19 C.F.R. § 353.37(b) ("The best information available may include the factual information submitted in support of the petition or subsequently submitted by interested parties....""). As Commerce's calculation uses previously verified data that are probative of Thai Union's zinc usage, coupling costs, and overall actual production experience, the Court concludes the calculation is rationally related to Thai Union's zinc usage and coupling cost. *See Manifattura Emmepi,* 16 CIT at ——, 799 F.Supp. at 115.

### 2. BIA Selected for Thai Union's Credit Costs

Plaintiffs also challenge the ITA's use of BIA with respect to Thai Union's credit costs. Plaintiffs contend the ITA should have used Thai Union's company-specific interest rate for purposes of granting the company a credit cost adjustment instead of resorting to the IMF country-wide lending rate as BIA. Additionally, plaintiffs claim Commerce improperly denied Thai Union any offset for its actual interest income against the imputed IMF rate.

Plaintiffs' position is without merit. As indicated previously, Commerce may resort to BIA whenever the information it receives pursuant to a request is incomplete, inaccurate, or untimely. 19 C.F.R. § 353.-37(a)(1). In addition, Commerce may use BIA when a respondent provides only partially complete answers to information requests. *Olympic Adhesives, Inc. v. United States,* 8 Fed.Cir.(T) 69, 76, 899 F.2d 1565, 1572 (1990). In this case, Commerce resorted to BIA because the data related to Thai Union's company-specific credit costs did not distinguish between credit costs attributable to short-term and long-term debt and did not account for other factors such as grace periods or balloon payments. *See* Confid.R.Doc. 22 at 1095–96; *Final Review,* 56 Fed.Reg. at 58,358. Moreover, information pertaining to

the cost differences between short-term and long-term loans and to factors such as grace periods and balloon payments is clearly material to Commerce's assessment of whether and to what extent Thai Union incurred credit expenses on sales to the United States. As a result, the Court concludes Thai Union's data deficiencies entitled Commerce to resort to BIA. *See Olympic Adhesives,* 8 Fed. Cir.(T) at 76, 899 F.2d at 1572; 19 C.F.R. § 353.37(a)(1).

Once Commerce has decided to use BIA for purposes of imputing credit costs, the BIA which the agency eventually selects must conform to commercial reality and be imputed on the basis of usual and reasonable commercial behavior. *See LMI–La Metalli Industriale, S.p.A. v. United States,* 8 Fed. Cir.(T) 157, 163, 912 F.2d 455, 460–61 (1990). The Court finds Commerce's rationale for resorting to the IMF rate satisfies the guidelines established in *LMI–La Metalli* for imputing credit costs. As stated in the *Final Review,*

> [a]lthough the Department prefers to use data from a respondent company's actual borrowing experience in its credit cost calculations, in this case the lack of information on the record as to the exact nature and terms of Thai Union's debt leads the Department to believe that the IMF's country-wide lending rate, which is the maximum rate charged by commercial banks for short-term export-related loans, is a more objective indicator of short-term commercial credit costs in Thailand than the other alternative presented.

56 Fed.Reg. at 58,358. Plaintiffs have failed to demonstrate Commerce's selection of the IMF rate as BIA is inconsistent with commercial reality or usual and reasonable commercial behavior. The mere fact that the IMF rate is the "maximum rate charged by commercial banks for short-term export-related loans" does not make the rate any less of a realistic benchmark for imputing credit costs. In addition, the Court agrees with the ITA that the IMF rate is an objective indicator of short-term commercial credit costs.

Because the IMF rate only applies to short-term, export-related loans and is a commercially acceptable benchmark rate for such loans, the Court concludes the ITA correctly used the rate as BIA for purposes of imputing credit expenses on Thai Union's sales to the United States.

The Court also finds Commerce properly refused to offset the imputed IMF rate by Thai Union's interest income. It is well-settled that where a respondent supplies Commerce with only partially complete information with respect to a particular issue, Commerce may resort to BIA and reject the respondent's submission in its entirety. *See, e.g., Chinsung Indus. Co. v. United States,* 13 CIT 103, 106–07, 705 F.Supp. 598, 601–02 (1989) (holding that respondents' failure to provide the ITA with complete and verifiable information entitled the ITA to use BIA and reject portions of response that were incomplete); *Ceramica Regiomontana,* 10 CIT at 406, 636 F.Supp. at 967 ("If the information received at the representative firms proves, as here, inaccurate in significant and material respects, it would be pointless to require that the ITA nevertheless use all information not proven correct."). This principle exists in recognition of the fact that if Commerce were to use only portions of a response that were verifiable, Commerce " 'would allow respondents to selectively submit data that would be to their benefit in the analysis of their selling practices.' " *Chinsung,* 13 CIT at 106, 705 F.Supp. at 601 (citation omitted). In this case, the ITA refused to grant Thai Union an offset for its interest income because the company failed to provide adequate information pertaining to its actual borrowing experience.[2] *Final Review,* 56 Fed.Reg. at 58,358. Because Commerce denied Thai Union the offset on account of the company's failure to supply accurate and verifiable information concerning its credit costs, the Court concludes Commerce properly refused to offset the imputed IMF rate by Thai Union's interest income. *See Chinsung,* 13 CIT at 106–07, 705 F.Supp. at 601–02; *Cera-*

---

**2.** As discussed immediately above, the information relating to Thai Union's actual borrowing experience was deficient because it did not ade-

quately reflect the company's short-term credit costs.

*mica Regiomontana,* 10 CIT at 406, 636 F.Supp. at 967.

## B. *Duty Drawback*

■ Plaintiffs also contend the ITA erred in denying Thai Union an upward adjustment to its United States price based on duty drawbacks that the company received. Plaintiffs rely on the fact that in a related countervailing duty investigation Commerce found Thai Union received rebates of import taxes under the same program upon which the company based its request in the anti-dumping duty review for an adjustment to its United States price. Pl.Coalition's Br. at 33. As a result, plaintiffs assert the ITA had sufficient information before it to grant Thai Union a duty drawback adjustment. *Id.*

Plaintiffs' claims are unpersuasive. The record in this case clearly indicates Thai Union failed to submit verifiable information regarding its claims to duty drawback. As Commerce noted in the *Final Review,*

> even though Department officials spent several days at verification discussing the issue of duty drawback with Thai Union officials, none of Thai Union's representatives was able to explain the documentation contained in Thai Union's duty drawback file, to reconstruct the figures reported in the response, or even to suggest how a duty drawback figure for each individual sale should be computed. During the verification, Department officials discovered that the tax certificate chart shown to them was incomplete and that there were additional shipments not appearing on the chart. When, after several days, Thai Union representatives were still unable to document the duty drawback payments the company had received, Department officials terminated the verification.

56 Fed.Reg. at 58,358; *see also* Conf.Rec. Doc. 42 at 2569–70. Counsel for Thai Union eventually submitted additional documentation on the drawback issue, but only after verification ended. The burden of creating a record from which the ITA could determine whether Thai Union was entitled to a duty drawback adjustment rested with Thai Union, not Commerce. *See Tianjin Mach. Import & Export Corp. v. United States,* 16 CIT

———, ———, 806 F.Supp. 1008, 1015 (1992) ("[T]he burden of creating an adequate record lies with respondents and not with Commerce."). The Court concludes Thai Union failed to supply the ITA with sufficient verifiable information to substantiate its claims for a duty drawback adjustment.

The Court also finds Commerce's findings with respect to the company's duty drawback in a separate countervailing duty investigation are irrelevant to the antidumping duty administrative review at issue. In addition to maintaining separate records in the countervailing duty and antidumping duty investigations, Commerce employs diverse investigative methodologies in the two proceedings. *Cf. Huffy Corp. v. United States,* 10 CIT 214, 220, 632 F.Supp. 50, 55 (1986) ("In a dumping investigation the ITA is not seeking the same information or asking the same questions it would in a countervailing duty investigation."). As a result, the Court concludes Commerce properly limited itself to the information that Thai Union submitted in the antidumping duty order administrative review.

## C. *Below–Cost, Home Market Sales*

■ As a final matter, plaintiff Intrepid asserts the ITA improperly disregarded certain below-cost, home market sales by Thai Union in assessing foreign market value. Specifically, Intrepid maintains the ITA failed to examine the applicable criteria set forth in 19 U.S.C. § 1677b(b), which indicate under what circumstances the ITA may disregard below-cost sales.

Plaintiff Intrepid's position lacks merit. Section 1677b(b) requires Commerce to disregard below-cost, home market sales when determining foreign market value if such sales "(1) have been made over an extended period of time and in substantial quantities; and (2) are not at prices which permit recovery of all costs within a reasonable period of time in the normal course of trade." 19 U.S.C. § 1677b(b). Contrary to plaintiff Intrepid's position, the ITA clearly assessed § 1677b(b)'s factors in the *Final Review.* With respect to the first inquiry under the statute, Commerce specifically found Thai Union made below-cost, home market sales

"during each of the 17 months covered by the review period." *Final Review,* 56 Fed.Reg. at 58,360. The ITA also indicated the time frame proposed by the respondents showed Thai Union had a substantial volume of sales "at below-cost prices over an extended period of time." *Id.* at 58,360–61. As to the second statutory inquiry, Commerce found Thai Union incurred a large revenue shortfall "on its below-cost sales of the subject merchandise." *Id.* at 58,361. On the basis of the company's revenue shortfall, the ITA "concluded that Thai Union's below-cost sales did not permit recovery of all costs within a reasonable period of time in the normal course of trade." *Id.* The Court finds the foregoing passages clearly demonstrate Commerce expressly considered the factors enumerated in 19 U.S.C. § 1677b(b).

## V. CONCLUSION

After considering all of plaintiffs' arguments, the Court makes the following holdings: (1) Commerce's selection of BIA for determining Thai Union's COP is supported by substantial evidence on the record and is otherwise in accordance with law; (2) Commerce's selection of BIA for determining Thai Union's credit costs is supported by substantial evidence on the record and is otherwise in accordance with law; (3) Commerce's decision to deny Thai Union an offset for its interest income is supported by substantial evidence on the record and is otherwise in accordance with law; (4) Commerce's decision to deny Thai Union an upward adjustment in its United States price for duty drawback is supported by substantial evidence on the record and is otherwise in accordance with law; and (5) Commerce's decision to disregard Thai Union's below-cost, home market sales is supported by substantial evidence on the record and is otherwise in accordance with law. *See* 19 U.S.C. § 1516a(b)(1)(B). Therefore, except with respect to the issues specified in the parties' Stipulation of May 27, 1993, the Final Review is sustained and plaintiffs' motion for judgment upon the agency record is denied. The Court remands the matter to Commerce to address the issues detailed in the parties' Stipulation of May 27, 1993.

## ORDER

**ORDERED** that the matter is remanded to Commerce to address the issues detailed in the parties' Stipulation of May 27, 1993. Remand results are due within forty days of the date of this opinion. Any comments or responses by the parties to the remand results are due within thirty days thereafter. Any rebuttal comments are due within fifteen days of the date upon which responses or comments are due.