SLIP-OP 02-93

UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
                                          :
TUNG MUNG DEVELOPMENT CO., LTD.,          :
                                          :
          Plaintiff,                      :     Before: WALLACH, Judge
                                          :     Consol. Court No.: 99-07-00457
     and                                  :
                                          :
YIEH UNITED STEEL CORP.,                  :
                                          :
          Plaintiff-Intervenor,           :
                                          :
     v.                                   :
                                          :
UNITED STATES,                            :
                                          :
          Defendant,                      :
                                          :
     and                                  :
                                          :
ALLEGHENY LUDLUM CORP. et al.,            :
                                          :
          Defendant-Intervenors.          :
_____ :
```

[Remand Determination affirmed]

Decided: August 22, 2002

Akin, Gump, Strauss, Hauer & Feld, LLP. (Patrick F. J. Macrory, Thomas J. McCarthy), for Plaintiff.

White & Case (William J. Clinton, Adams Lee), for Plaintiff-Intervenor.

Robert D. McCallum, Jr., Assistant Attorney General; David M. Cohen, Director; Lucius B. Lau, Assistant Director; Scott D. McBride, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for Defendant.

Collier Shannon Scott, PLLC (David A. Hartquist, Jeffrey S. Beckington, Adam H. Gordon), for Defendant-Intervenors.

**OPINION**

**WALLACH, Judge**

**I**

**Preliminary Statement**

Allegheny Ludlum Corporation, Armco, Inc., Butler Armco Independent Union, J&L Specialty Steel Inc., The United Steelworkers of America, AFL-CIO/CLC, and Zanesville Armco Independent Organization ("Defendant-Intervenors" or "Petitioners") dispute the United States Department of Commerce International Trade Administration's ("Commerce" or "the Department") finding in Commerce's Final Results of Redetermination Pursuant to Court Remand, Tung Mung Development Co. v. United States, Slip op. 01-83 (July 3, 2001) ("Remand Determination") that the imposition of combination rates in a middleman dumping situation in which the producer has no knowledge of the middleman's dumping comports with the provisions of the antidumping statute. Defendant-Intervenors' challenge follows the remand of Commerce's decision in Notice of Final Determination of Sales at Less Than Fair Value: Stainless Steel Sheet and Strip in Coils From Taiwan, 64 Fed. Reg. 30,592 (June 8, 1999) ("Final Determination").

2

The court finds that Commerce, by applying a combination rate consistent with its prior practice, has made its Remand Determination in accordance with the law.

## II

## Background

On June 10, 1998, the domestic industry filed an antidumping petition alleging that imports from Taiwan of stainless steel sheet and strip in coils ("SSSS") were being injuriously dumped in the United States. The Department initiated an antidumping duty investigation on July 13, 1998. See Initiation of Antidumping Duty Investigations: Stainless Steel Sheet and Strip in Coils from France, et al., 63 Fed. Reg. 37,521 (July 13, 1998).

Yieh United Steel Corp. ("YUSCO") and Tung Mung Development Co., Ltd. ("Tung Mung"), Taiwanese producers of the subject merchandise, were selected as respondents in the Taiwan investigation. During the period covered by the Department's investigation, April 1, 1997, through March 31, 1998, YUSCO and Tung Mung made United States sales of subject SSSS through middleman Ta Chen Stainless Pipe Co., Ltd. ("Ta Chen").[1]

On October 14, 1998, petitioners submitted allegations of middleman dumping by Ta Chen of subject merchandise produced by Tung Mung; on October 15, 1998, petitioners

---

[1] Ta Chen was also investigated as part of this investigation. Ta Chen has not appealed Commerce's determination of dumping and assignment of a cash deposit rate, which was issued on the basis of adverse facts available.

Tung Mung also made direct sales to the United States, to an affiliate of Ta Chen.

submitted allegations of middleman dumping by Ta Chen of subject merchandise produced by YUSCO. On December 3, 1998, the Department initiated a middleman dumping investigation with respect to sales by Ta Chen of YUSCO's and Tung Mung's subject merchandise. Notice of Amended Preliminary Determination of Sales at Less Than Fair Value: Stainless Steel Plate in Coils From Taiwan, 63 Fed. Reg. 66,785 (Dec. 3, 1998). On January 4, 1999, Commerce published its preliminary determination. Notice of Preliminary Determination of Sales at Less Than Fair Market Value and Postponement of Final Determination: Stainless Steel Sheet and Strip in Coils from Taiwan, 64 Fed. Reg. 101 (Jan. 4, 1999) ("Preliminary Determination"). In the Preliminary Determination, Commerce calculated a weighted-average dumping margin of 2.94 percent for YUSCO and a weighted-average dumping margin of .07 percent for Tung Mung, in each instance exclusive of any dumping by the middleman. Id. at 108. Commerce made no preliminary determination with regard to the middleman dumping investigation, which was incomplete. The parties to the investigation submitted briefs on May 3, 1999.

On June 8, 1999, Commerce published the Final Determination, in which it assigned YUSCO a single weighted average rate of 34.95 percent, and Tung Mung a single weighted-average rate of 14.95, based largely on the rate assigned for the middleman Ta Chen. Final Determination, 64 Fed. Reg. at 30,624. This decision was subsequently challenged by Tung Mung and YUSCO in the parties' USCIT Rule 56.2 Motion For Judgment On The Agency Record, where both parties disputed Commerce's decision to assign a single, weighted-average cash deposit dumping rate to their merchandise, regardless of the channel of distribution through which that merchandise is sold. Tung Mung and YUSCO argued that imposition of a single rate

4

is contrary to congressional intent, and would impose an excessive cash deposit rate on merchandise that is not "tainted" by the middleman dumping found by the Department.

In Tung Mung Dev. Co. v. United States, __ CIT __, Slip op. 01-83, 2001 Ct. Intl. Trade LEXIS 94, at *1 (July 3, 2001) ("Tung Mung I"), this court remanded the Department's determination on the issue of the single, weighted-average rate, noting that Commerce's application of a single weighted-average rate constituted a significant departure from its usual practice. Id. at *54. In analyzing the appropriateness of this rate in a middleman dumping situation, the court examined the plain language of the dumping statute, id. at *15, as well as Commerce's relevant regulations, id. at *28, and concluded that none of the statutory and regulatory provisions cited by the parties either supported or explicitly foreclosed Commerce's use of the single, weighted-average cash deposit rate. [2] Id. at *49. In addition, the court

---

[2] The court examined the dumping statute's definitions of "dumping margin," "export price," "normal value," "subject merchandise," and "foreign like product." Tung Mung I, 2001 Ct. Intl. Trade LEXIS 94, at *15-18; see 19 U.S.C §1677, 1677a, 1677b (1999). The court found that none of these definitions were dispositive on the issue. Id. In addition, the court examined 19 U.S.C. §1673d(c), for Commerce's authority to compute a dumping margin and impose a cash deposit rate, as well as 19 U.S.C. §1673b(a) and §1673d(a), together with the legislative history to 19 U.S.C. §1677a, for Commerce's authority to consider the full range of dumping. The court similarly found that none of these sections provided any guidance in the instant case and were therefore not dispositive of the issue. Id. At *18-30. The court did, however, note that 19 U.S.C. §1673d(c)(1)(B)(i), which requires Commerce to "determine the estimated weighted average dumping margin for each exporter and producer individually investigated", supports Tung Mung's position as it tends to indicate that a separate dumping rate must be computed for each respondent. Id. at *26. The court further added that "[t]his construction is supported by Commerce's own regulation, at 19 C.F.R. §351.204(c)(1) (1998), which states that 'in an investigation, the Secretary will attempt to determine an individual weighted-average dumping margin . . . for each known exporter or producer of the subject merchandise.' Id. Finally, the court examined Department's regulation at 19 C.F.R. §351.107 and the preamble thereto, and found that "the regulation... does not speak directly to the issue presented in this case." Id. at *29. Discussing the preamble to the regulation, the court noted that:

examined Commerce's prior practice in the area of middleman dumping, noting that the present case was the first instance in which the Department was imposing a single weighted-average rate in a middleman dumping investigation.[3]  The court further remarked that there were only three occasions on which the Department had rendered a final affirmative middleman dumping investigation: Notice of Final Determination of Sales at Less Than Fair Value: Stainless Steel Plate in Coils From Taiwan, 64 Fed. Reg. 15,493 (March 31, 1999) ("SSPC From Taiwan"); Antidumping; Fuel Ethanol from Brazil; Final Determination of Sales at Less Than Fair Value, 51 Fed. Reg. 5,572 (Feb. 14, 1986) ("Fuel Ethanol from Brazil"); and the instant case.  The court therefore instructed Commerce to "either provide a reasonable explanation and substantial evidence for its change in practice, or . . . apply a combination rate, consistent with its prior

> [r]eview of the Preamble provides no support for the use of a single, weighted average rate, and certainly does not mandate such a method.  It does not even contain a discussion of such a rate in this context.  To the contrary a review of all of the preamble indicates that a combination rate may well be proper in the instant case, although the court defers to Commerce's authority to make the determination as to whether a combination rate or some other rate is appropriate."

Id. at *48-49.  The court further emphasized that "this Preamble, and the associated regulation, do not constitute an agency construction of the statute at issue, on the issue of a single, weighted average rate, such as would trigger Chevron deference." Id. at *49.

[3] The court also noted that "[t]he court's research, and the responses of the parties at oral argument, reveal only two instances in which a dumping margin is based on the activities of parties other than the respondent at issue: in nonmarket economy cases, and in 'collapsing' cases, where Commerce has made findings to support a determination that affiliated companies should be treated as a single entity, and thus receive a single, weighted average dumping margin." Id. at *47.

practice." Id. at *59.

In its Remand Determination, Commerce determined "that it is appropriate in this instance to apply a middleman dumping computation using combination rates." Remand Determination at 2. Commerce first noted that "[f]indings of middleman dumping are rare" and that "Congress provided no statutory guidance for the means by which the Department would determine its methodology for capturing those sales." Id. at 2-3. After explaining the inherent difficulties associated with middleman dumping, [4] Commerce examined the various cash deposit methodologies available to it in such situations. Commerce could either apply the methodology offered by the Department in the Final Determination, or resort to the application of a combination rate. Commerce explained that the latter was appropriate here since "as noted by the Court in its holding and during the hearing, use of combination rates may be appropriate when a producer uses a middleman for some of its commercial transactions and, while aware that the merchandise is destined for the United States, is unaware that the middleman is dumping that merchandise." Id. at 7. Consequently, Commerce concluded that "because the Department has no basis to believe or suspect that the producer was aware or should have been aware that the middleman would be likely to dump subject merchandise into the United States, the Department

---

[4] Commerce notes that "[t]he presumption built into the law and our practice is that the locus of the dumping will be found in the first sale of subject merchandise to an unaffiliated party where the seller knows the merchandise is destined for the United States." Remand Determination at 4. However, Commerce explains that "[i]n middleman dumping situations... this presumption does not hold true. Where there is middleman dumping, the producer may be dumping its goods in its sales to the unaffiliated exporter, that exporter may be dumping the goods in its sales to the unaffiliated purchaser in the United States, or both parties may be dumping the same merchandise." Remand Determination at 5 (emphasis in original).

7

is inclined to calculate a combination rate for the producer and middleman." Id. at 8.[5]

## III

## Jurisdiction and Standard of Review

The court has jurisdiction pursuant to 28 U.S.C. 1581(c) (1999).

This court will sustain Commerce's Remand Determination unless it is "unsupported by

---

[5] To support this conclusion, Commerce cites to the Department's regulation at 19 C.F.R. §351.107. Remand Determination at 6-7. More specifically, Commerce cites to 19 C.F.R. §351.107(b), which provides as follows:

> b) Cash deposit rates for non-producing exporters -
>
> (1) Use of combination rates -
> In general. In the case of subject merchandise that is exported to the United States by a company that is not the producer of the merchandise, the Secretary may establish a "combination" cash deposit rate for each combination of the exporter and its supplying producer(s).

Commerce further cites to the preamble accompanying 19 C.F.R. §351.107(b), which states that the Department believes that, as a rule, "it is not appropriate to establish combination rates in an AD investigation or review of a producer; *i.e.*, where a producer sells to an exporter with knowledge of exportation to the United States."Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,303 (May 19, 1997)(Final rule). Commerce also adds that "the establishment of separate rates for a producer in combination with each of the exporters through which it sells to the United States could lead to manipulation by the producer." Remand Determination at 7. However, Commerce adds that combination rates may nevertheless be appropriate in situations where the "producer uses a middleman for some of its commercial transactions and, while aware that the merchandise is destined for the United States, is unaware that the middleman is dumping that merchandise." Id. at 7.

substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. §1516a(b)(1)(B) (1999). Substantial evidence is something more than a "mere scintilla," and must be enough evidence to reasonably support a conclusion. Primary Steel, Inc. v. United States, 17 C.I.T. 1080, 1085, 834 F. Supp. 1374, 1380 (1993); Ceramica Regiomontana, S.A. v. United States, 10 C.I.T. 399, 405, 636 F. Supp. 961, 966 (1986), *aff'd*, 810 F.2d 1137 (Fed. Cir. 1987). A determination as to whether the agency's interpretation of the statute is in accordance with law requires of the court to "carefully investigate the matter to determine whether Congress's purpose and intent on the question at issue is judicially ascertainable." Timex V.I. Inc. v. United States, 157 F.3d 879, 881 (Fed. Cir. 1998). Congress's expressed will or intent on a specific issue is dispositive. See Japan Whaling Ass'n v. American Cetacean Soc'y, 478 U.S. 221, 233-237, 106 S.Ct. 2860, 92 L. Ed.2d 166 (1986). If the statute is silent or ambiguous, the court must determine whether the agency's construction of the statute is permissible. See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L. Ed.2d 694 (1984). Deference is due "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." United States v. Mead Corp., 533 U.S. 218, 226-27, 121 S.Ct. 2164, 2171, 150 L.Ed.2d 292, 303 (2001). The delegation of this authority "may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent." Id. at 227. Consequently, statutory interpretations articulated by Commerce during its antidumping proceedings are entitled to judicial deference under

9

Chevron. Pesquera Mares Australes Ltda. v. United States, 266 F.3d 1372, 1382 (Fed. Cir. 2001). This court must therefore inquire into the reasonableness of Commerce's interpretation. See Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1038 (Fed. Cir. 1996).

## IV

## Analysis

## A

## Combination Rates Comport with the Antidumping Statute's Characterization of Dumping Duties as a Remedial Instrument

The antidumping statute requires Commerce to impose antidumping duties on imported merchandise that is being sold, or is likely to be sold, in the United States at less than fair value to the detriment of a domestic industry. See 19 U.S.C. §1673 (1999). "The purpose underlying the antidumping laws is to prevent foreign manufacturers from injuring domestic industries by selling their products in the United States at less than 'fair value,' i.e., at prices below the prices the foreign manufacturers charge for the same products in their home markets." Torrington Co. v. United States, 68 F.3d 1347, 1352 (Fed. Cir. 1995). The duty that is consequently imposed is the amount by which the price charged for the subject merchandise in the home market exceeds the price charged in the United States. See 19 U.S.C. §1673. In other words, the statute's function is remedial in that its purpose is reducing or eliminating discrepancies in pricing

10

between the US and foreign markets. U.S. Steel Group v. United States, 177 F. Supp. 2d 1325, 1330 (CIT 2001); See also C.J. Tower & Sons v. United States, 21 C.C.P.A. 417, 427, 71 F.2d 438 (1934) (stating that the statute's object is "to impose not a penalty, but an amount of duty sufficient to equalize competitive conditions between the exporter and American industries affected"); Micron Tech., Inc. v. United States, 243 F.3d 1301, 1313 (Fed. Cir. 2001) ("The overarching purpose of the antidumping statute is to permit a fair, apples-to-apples comparison between foreign market value and United States price . . .") (internal quotations omitted); NTB Bearing Corp. v. United States, 74 F.3d 1204, 1208 (Fed. Cir. 1995) (stating the antidumping laws "are remedial not punitive"); 19 U.S.C. §1677b(a) (providing that "a fair comparison shall be made between the export price or constructed export price and normal value").

Defendant-Intervenors argue that C.J. Tower shows the remedial nature of the antidumping statute because it held the antidumping statute's objective is "to impose not a penalty, but an amount of duty sufficient to equalize competitive conditions between the exporter and American industries affected." C.J. Tower, 71 F.2d at 427.  They argue that since the antidumping law is remedial, not punitive in nature, the Department's rationale "that a single, weighted-average cash deposit rate would penalize or unduly burden the foreign producer should fail." Defendant-Intervenors' Comments in Accordance with the Court's Order Dated July 3, 2001 ("Defendant-Intervenors' Brief") at 3.  According to Defendant-Intervenors, antidumping duties are inherently non-punitive with regards to foreign producers, as "an importer's payment of antidumping duties does not constitute a penalty against, and does not unduly burden, the foreign producer that is not responsible for or subject to paying antidumping duties." Id. at 4.  In

11

other words, Defendant-Intervenors appear to be arguing that because antidumping duties are a tax, concerns for unduly punishing a foreign respondent should be disregarded, and in the present case, a single weighted-average rate should be applied.

As Defendant correctly points out, however, it is precisely because antidumping duties are a tax and not a penalty, that Commerce applied a combination rate. Defendant's Memorandum in Opposition to Defendant-Intervenors' Memorandum with Respect to the Final Results of Redetermination of the United States Department of Commerce ("Defendant's Memo") at 11-12. The remedial purpose of the statute is fulfilled because a combination rate adequately offsets the dumping margin for goods exported through the middleman, but does not impose duties on non-dumped goods exported directly from the producer.[6] In its Remand

---

[6] Moreover, Defendant-Intervenors' reliance on C.J. Tower for the principle that antidumping duties are a tax and not a penalty ignores the passage of the Uruguay Round Agreement Act. The URAA specifically codified the remedial nature of the antidumping statute in 19 U.S.C. §1673d(b)(4)(A), which provides as follows:

§ 1673d. Final Determinations

    (b)      Final Determination by Commission
          (4)      Certain additional findings
             (A) Commission standard for retroactive application
             (i) In general. If the finding of the administering authority under subsection (a)(3) is affirmative, then the final determination of the Commission shall include a finding as to whether the imports subject to the affirmative determination under subsection (a)(3) of this section are likely to undermine seriously the remedial effect of the antidumping duty order to be issued under section 1673e of this title.
             (ii) Factors to consider. In making the evaluation under clause (i), the Commission shall consider, among other factors it considers relevant –
                (I) the timing and the volume of the imports,
                (II) a rapid increase in inventories of the imports, and
                (III) any other circumstances indicating that the remedial effect of

Determination, Commerce specifically explained that the application of combination rates in circumstances where there is "no basis to believe or suspect that the producer was aware or should have been aware that the middleman would be likely to dump subject merchandise into the United States . . . avoids penalizing the producer for dumping for which it is not responsible, and encourages the producer to find a middleman who will not engage in dumping." Remand Determination at 8. Since there is no evidence on the record that Tung Mung and YUSCO were aware or should have been aware that Ta Chen was dumping their merchandise, Commerce's decision to apply combination rates counters neither any remedial purposes of the antidumping statute nor the holding in C.J. Tower.

Plaintiff also correctly points out that the holding in C.J. Tower actually supports the Department's results. Plaintiff's Response to Defendant-Intervenors' Comments Dated January 2, 2002 ("Plaintiff's Response") at 3. The Court in C.J. Tower specifically noted that the antidumping statute's purpose is to impose "an amount of duty sufficient *to equalize competitive conditions* between the exporter and American industries affected ." C.J. Tower, 71 F.2d at 427 (emphasis added). Given that Tung Mung's direct sales to the United States were not dumped, "there is no basis or need for imposing antidumping duties to equalize competitive conditions." Plaintiff's Response at 3 (internal quotations omitted).

As the antidumping law is remedial, its consequent application must fulfill this remedial

---

the antidumping order will be seriously undermined.

See Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994); 19 U.S.C. §1673d..

purpose. Accordingly, Commerce's determination that combination rates are applicable does not conflict with the overarching purpose of the antidumping statute; C.J. Tower further supports this conclusion.


**B**

**Application of a Combination Rate on Foreign Producers Whose Merchandise is Dumped in the United States Does Not Violate Any Jurisdictional Requirements**


Defendant-Intervenors argue that "resort to combination rates when middleman dumping is present wrongly undermines the statute's remedy and jurisdictional base, that is, the imposition of antidumping duties on the subject merchandise that has been injuriously dumped in the United States." Defendant-Intervenors' Brief at 5. According to Defendant-Intervenors, "[n]owhere does there appear to be any legal authority for the proposition that the Department's jurisdiction is defined with reference to the foreign party or parties responsible for dumping." Id. at 5. This argument is an extension of Defendant-Intervenors' previous pre-remand argument that the dumping statute's emphasis on the term 'subject merchandise' encompasses all the subject merchandise produced by a given producer regardless of whether the dumping was done by the producer or a middleman. See Brief of Defendant-Intervenors in Response to Motion for Judgment on the Agency Record by Tung Mung Development Co., Ltd. at 5. This "subject merchandise" argument, however, was discarded in Tung Mung I, in which the court held that

14

the term "subject merchandise" "does not provide any guidance in the instant case, and does not support Defendant-Intervenors' argument. Indeed, given that many investigations involve merchandise produced by several different respondents, Defendant-Intervenors' construction of that term is untenable for use throughout the statute."[7] Tung Mung I, 2001 Ct. Intl. Trade LEXIS 94, at *21. Although these arguments are analytically similar, to the extent necessary they are discussed below.

A brief examination into the actual process of collecting duties is helpful in delineating the exact parameters of Commerce's activities, *i.e.*, its jurisdiction, when imposing the appropriate duty rate. As previously stated, U. S. law is designed to prevent a foreign firm from selling merchandise in the United States at prices lower than the prices it charges for a comparable product sold in its domestic market. See supra Part IV.A. Once an investigation of foreign respondents is undertaken, Commerce issues questionnaires to foreign producers and their affiliated importers requesting information on their commercial practices (questionnaires might inquire about, among other things, the investigated company's quantity and value of sales of the merchandise in all markets, its corporate structure and business practices, the merchandise under investigation or review that it sells). This information allows Commerce to make a price comparison between normal value and export price or constructed export price, as appropriate, given the definitions provided in 19 U.S.C. §1677a(a) and (b). See 19 U.S.C. §§1677a(a), (b).

---

[7] During oral argument, counsel for Defendant-Intervenors also cited to the Preamble of 19 C.F.R. §351.107 for the principle that a single weighted-average rate is applicable in the present case. See 62 Fed. Reg. 27,296 (May 19, 1997). The court will similarly not entertain this argument as it was explicitly dismissed in this court's remand opinion. See Tung Mung I, 2001 Ct. Intl. Trade LEXIS at *48-49.

The dumping margins are therefore the differences in the two prices and a separate dumping margin is calculated for each manufacturer or exporter investigated. See Queen's Flowers de Columbia v. United States, 21 C.I.T. 968, 971, 981 F.Supp. 617, 622 (1997). Once the antidumping order is issued, Commerce instructs the U.S. Customs Service to collect cash deposits of antidumping duties on merchandise that enters the United States or is withdrawn from a bonded warehouse. Although the cash deposit represents an estimate of the actual duties owed by the importers of record, the final amount of the duties collected will be determined by the administrative review. In other words, all that the antidumping order requires of the importers of record is that they post a cash deposit in order to offset the dumping margin. The antidumping order only applies to the merchandise that is dumped in the United States and not to the exporters per se. Jia Farn Mfg. Co. v. Secretary of the United States Dep't of Commerce, 17 C.I.T. 187, 817 F. Supp. 969 (stating that less than fair value "determinations and antidumping duty orders are rendered upon the subject merchandise from a certain country under the investigation"). The amount of the actual dumping rate, however, will depend on each respondents' extent of dumping. This analysis is the foundation of Commerce's jurisdiction.

Commerce's determination in the present case was within those jurisdictional parameters.[8] Commerce examined the behavior of the foreign parties, determined a dumping

[8]Defendant-Intervenors, in any case, have no standing in raising this jurisdiction argument. As Defendant correctly points out in its brief, a party "cannot rest his claim to relief on the legal rights or interests of third parties." Warth v. Seldin, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L. Ed.2d 343 (1975); Nordlinger v. Hahn, 505 U.S. 1, 11, 112 S.Ct. 2326, 120 L. Ed.2d 1 (1992) ("This Court's prudential standing principles impose a 'general prohibition on a litigant's raising another person's legal rights.'")(quoting Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L. Ed.2d 556 (1984)); Flast v. Cohen, 392 U.S. 83, 99 n.20, 88 S.Ct. 1942, 20

margin for each respondent, and imposed a combination rate in order to adequately offset the parties' dumping. As stated by Defendant, "[a]ll that Commerce has done in this instance (as in all other investigations, reviews, and remands) is to examine the behavior of foreign entities for purposes of its antidumping analysis." Defendant's Memo at 13. This activity does not amount to an improper exercise of jurisdiction over foreign respondents. On the contrary, Commerce's foremost goal was to reach the most accurate and fair results. As it said in its Remand Determination:

> [The] use of combination rates may be appropriate when a producer uses a middleman for some of its commercial transactions and, while aware that the merchandise is destined for the United States, is unaware that the middleman is dumping that merchandise. Under such a scenario, if the Department uses the average-rate methodology described above, although all of the dumping is being offset by the imposition of the antidumping duties, the producer will, in effect, be held responsible for unfair pricing engaged in by a middleman over which it had no control. Such an effect appears to be contrary to the Department's objective of associating dumping with the party or parties responsible for it.

Remand Determination at 7-8.

In addition, this notion of applying combination rates in order to associate dumping with the foreign respondents dumping the subject merchandise is not a novel concept. As Plaintiff-Intervenors point out, there are a number of instances where the Department has acknowledged that pursuant to section 777A of the Antidumping Statute, "the Department calculates an

---

L. Ed.2d 947 (1968)("[A] general standing limitation imposed by federal courts is that a litigant will ordinarily not be permitted to assert the rights of absent third parties"). See Defendant's Memo at 13-14.

17

individual weighted-average dumping margin for each known exporter or producer." Yieh United Steel Corp.'s Rebuttal Comments in Response to Defendant-Intervenors' Comments on DOC Remand Results at 5 (citing Notice of Final Determination of Sales at Less than Fair Value: Brake Drums and Brake Rotors from the People's Republic of China, 62 Fed. Reg. 9,160, (February 28, 1997), Notice of Final Determination of Sales at Less than Fair Value: Certain Preserved Mushrooms from the People's Republic of China, 63 Fed. Reg. 72,255, 72,257 (December 31, 1998)). Moreover, as Commerce noted in its Remand Determination, 19 C.F.R. §351.107(b) specifically provides that Commerce may apply a combination rate for each combination of an exporter and its supplying producer in the case of subject merchandise that is exported to the United States.[9] Remand Determination at 6-7. Associating the dumping with the appropriate foreign party is therefore a reasonable extension of this principle.

On this basis, this court finds that Commerce's decision to apply combination rates was directed at reaching exact results and was a proper exercise of its discretionary authority to determine the most appropriate dumping methodology. See 19 U.S.C. §1673d(c)(1)(B)(ii)

---

[9] 19 C.F.R. §351.107(b) contemplates situations where the Department is investigating or reviewing sales by a nonproducing exporter and the exporter's supplier has no knowledge that the merchandise is exported to the United States. While the present case does not present a situation where the exporter's supplier had no knowledge of the merchandise's ultimate destination, it is nevertheless a similar situation; the suppliers in both situations either have a zero percent or de minimis dumping margin. Most importantly, in both situations, Commerce examines the provenance of the particular merchandise and associates it with the appropriate dumping rate. See 19 C.F.R. §351.107(b).

(1999). Accordingly, the application of combination rates in the present case does not violate any of the antidumping statute's jurisdictional requirements.

**C**

**Department Fulfilled its Duty of Preventing Circumvention of The Antidumping Statute**

As stated in the Remand Determination, Commerce has a duty to avoid the evasion of antidumping duties. Remand Determination at 3. "The ITA has been vested with authority to administer the antidumping laws in accordance with the legislative intent. To this end, the ITA has a certain amount of discretion [to act] . . . with the purpose in mind of preventing the intentional evasion or circumvention of the antidumping duty law." Mitsubishi Elec. Corp. v. United States, 12 C.I.T. 1025, 1046, 700 F. Supp. 538, 555 (1988), *aff'd* 898 F.2d 1577 (Fed. Cir. 1990).

Defendant-Intervenors claim that the Department has created a test which undermines this fundamental duty. More specifically, they take issue with Commerce's statement that combination rates are appropriate in the present case "because the Department has no basis to believe or suspect that the producer was aware or should have been aware that the middleman would be likely to dump subject merchandise into the United States." Remand Determination at 8. According to Defendant-Intervenors, this test is poorly defined because it fails to articulate "what factors other than actual or imputed knowledge of the producer would be relevant to the

19

Department's test." Defendant-Intervenors' Brief at 8. Moreover, they emphasize the impracticable nature of this standard in that it would be extremely problematic to attach constructive knowledge of middleman dumping to a producer. Id. at 8-9.

Although Commerce did base its determination on a holding that it had no basis to attach knowledge or constructive knowledge upon the producer, nowhere in the Remand Determination does Commerce state that it has affirmatively established a universal test for deciding whether to apply a single, weighted-average cash deposit rate in middleman dumping cases. On the contrary, Commerce announced that in light of its limited experience with middleman dumping, it did "not intend by this decision to announce a settled practice." Remand Determination at 3. Commerce further emphasized that it was not establishing an "actual knowledge" or "reason to believe" test "for determining whether combination rates are appropriate when middleman dumping has been found to exist." Id. at 11. The appropriate methodology to apply in middleman dumping cases must rather be determined on a case-by-case basis. Id. "[T]he knowledge of the producer is one factor that the Department may take into consideration." Id. Commerce noted that the other instances where a single weighted-average rate would also be applicable is in nonmarket economy cases and in "collapsing" cases. Id. at 12. Because none of these situations are applicable in the present case, Commerce's decision to apply combination rates was therefore based on a factual record which provided no evidence of knowledge by the producer of middleman dumping. Id.

While it is true that establishing knowledge or constructive knowledge by the producer of middleman dumping might present some difficulties, it is no more problematical than

establishing knowledge of exportation to the United States. See 19 U.S.C. §1677a(a), (b) (1999) (stating that knowledge of exportation to the United States by either the producer or the exporter forms the basis for calculating the export price of the subject merchandise). One requires knowledge of the middleman's prices, while the other requires knowledge of the ultimate destination of the subject merchandise. These are all facts that may be determined during verification of the producer and the middleman. "It is therefore not unreasonable to analyze the knowledge of the producer in middleman dumping transactions as an important factor in determining if the use of a weighted-average or combination rate is appropriate." Remand Determination at 11-12.

In addition, Defendant-Intervenors argue that middleman dumping is an inherently strange behavior that indicates evasion of antidumping duties. Defendant-Intervenors' Brief at 10. They maintain that "[u]nder no easily imaginable circumstances will a middleman such as Ta Chen on its own be inclined and able to continue reselling merchandise at substantially below cost in substantial quantities." Id. at 11. They also argue that "by not penalizing a producer considered not to be responsible for middleman dumping," the Department's selection of combination rates in the present case will further encourage this middleman dumping. Id. Defendant, however, argues that Defendant-Intervenors' arguments "suffer from speculation" and that "[m]ere speculation upon the part of [Defendant-Intervenors] does not detract from Commerce's finding that it has 'no basis to believe or suspect that the producer was aware or should have been aware that the middleman would be likely to dump subject merchandise into the United States.'" Defendant's Memo at 15 (citation omitted).

While the possibility always exists that prices on the subject merchandise were lowered through concealed rebates, there is absolutely no evidence on the record that the present case involves such a situation. "Commerce is required to verify the information upon which it relied in making its final determination." Tatung Co. v. United States, 18 C.I.T. 1137, 1140 (1994). This verification "is like an audit, the purpose of which is to test information provided by a party for accuracy and completeness." Bomont Indus. v. United States, 14 C.I.T. 208, 209, 733 F. Supp. 1507 (1990). Although evasion is a common possibility, auditors will research further only when they discover facts indicating the actuality thereof. Id. The burden, however, rests on the parties to create an adequate record, Tatung Co., 18 C.I.T. at 1140; Chinsung Indus. Co. Ltd. v. United States, 13 C.I.T. 103, 106, 705 F. Supp. 598, 601 (1989), and "[s]peculation is not support for a finding of failure to verify." Asociacion Colombiana de Exportadores de Flores v. United States, 13 C.I.T. 13, 15, 704 F. Supp. 1114, 1117 (1989) aff'd, 901 F.2d 1090 (Fed.Cir. 1990). Since no evidence of collusion surfaced during verification of the producer and the middleman, Defendant-Intervenors' argument amounts to pure speculation. As Defendant correctly points out, "[t]o the extent that [Defendant-Intervenors are] concerned about evasion of dumping duties . . . it suffices to note that Commerce is well-aware of the enforcement issues associated with the use of combination rates in middleman dumping cases (Remand Determination at 29) and has indicated that, given its limited experience with middleman dumping, it 'does not intend by this decision to announce a settled practice.' [Defendant-Intervenors'] concerns about evasion in future cases should be addressed and resolved when such cases arise." Defendant's Memo at 15-16 (internal citations omitted).

Accordingly, Commerce has fulfilled its duty of preventing the evasion of antidumping duties through the imposition of combination rates where there is no evidence on the record that the producer had knowledge of the middleman's dumping.

**V**

**Conclusion**

For the foregoing reasons, the court finds that Commerce's Remand Determination is supported by substantial evidence and in accordance with the law.

_____

Evan J. Wallach, Judge

Dated:      August 22, 2002
New York, New York