**Slip Op. 10-87**


**UNITED STATES COURT OF INTERNATIONAL TRADE**


TIANJIN MAGNESIUM INTERNATIONAL :
CO., LTD., :
                                      :
                           *Plaintiff,*  :
                                      :  **Before**: TSOUCALAS, Senior
                                      :           Judge
           v.                         :
                                      :  **Public Version**
UNITED STATES,                        :
                                      :  **Consol. Court No. 09-00012**
                           *Defendant,*  :
                                      :
           and                        :
                                      :
US MAGNESIUM LLC,                     :
                                      :
                           *Defendant-*  :
                           *Intervenor.* :
                                      :


**OPINION**

**Held**: The Department of Commerce's final results of antidumping
administrative review for pure magnesium from the People's
Republic of China is affirmed in part and remanded in part.

                                        Dated: August 9, 2010


Riggle & Craven (David A. Riggle, David J. Craven, and Shitao Zhu)
for Plaintiff Tianjin Magnesium International Co., Ltd.


Tony West, Assistant Attorney General; Jeanne E. Davidson,
Director; Patricia M. McCarthy, Assistant Director, Commercial
Litigation Branch, United States Department of Justice (David S.
Silverbrand and Patryk J. Drescher) for Defendant United States.


King & Spalding, LLP (Stephen A. Jones, Jeffrey B. Denning, and
Jeffrey M. Telep) for Defendant-Intervenor, US Magnesium LLC.

**Tsoucalas, Senior Judge**: Plaintiff Tianjin Magnesium International Co., Ltd., ("TMI") and Defendant Intervenor US Magnesium LLC ("USM") each move for judgment on the agency record pursuant to USCIT R. 56.2, challenging the final determination of the Department of Commerce (the "Department" or "Commerce") in Pure Magnesium from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 73 Fed. Reg. 76,336 (Dep't Commerce Dec. 16, 2008) ("Final Results").

Plaintiff asserts that Commerce acted arbitrarily, capriciously, and not in accordance with law when it revoked its previous decision to defer administrative review by one year and also caused TMI irreparable harm when it failed to provide notice of the rescission. Plaintiff further claims that the Department incorrectly calculated the surrogate financial ratios. See Mem. in Supp. of the Mot. for J. on the Agency R. Submitted by Pl. TMI ("TMI's Br."); see also Def.'s Resp. in Opp'n to Pl.'s and Def. Intervenor's Mots. for J. Upon the Agency R. ("Def.'s Br."); USM's Resp. to TMI's Br. in Supp. of Mot. for J. on the Agency R. ("USM's Resp."); Reply of Pl. TMI ("TMI's Reply"). Defendant Intervenor moves that Commerce's actions were not supported by substantial evidence and in accordance with law when it (1) assessed the surrogate value for TMI's magnesium byproduct; (2) used Indian domestic data to assign a surrogate value for dolomite; (3) failed to select the best available financial statement to value the financial ratios; and (4) refused to apply a combination rate to TMI. See USM's R. 56.2 Confidential Br. in Supp. of Mot. for J. on the Agency R. ("USM's Br."); see also Resp. Br. of TMI to the R. 56.2 Mot. of USM ("TMI's Resp."); Reply Br. of USM ("USM's Reply").

**PROCEDURAL HISTORY**

In accordance with Section 751 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1675 (2006)[1] and 19 C.F.R. § 351.213(b), Commerce published notice of an opportunity to request administrative review for exporters or producers covered by the antidumping duty order for pure magnesium from the People's Republic of China ("PRC") during the period of review from May 1, 2006, through April 30, 2007 (the "POR"). See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review, 72 Fed. Reg. 23,796 (Dep't Commerce May 1, 2007). Pursuant to that announcement, both TMI and Economic Consulting Services, LLC ("ECS"), an agent of USM, requested review of TMI's exports. See PR 2.[2] Plaintiff also asked that the review be deferred for one year and consolidated with the next administrative review ("TMI's deferral request"). See PR 3.

On June 29, 2007, the Department initiated administrative review with respect to another respondent, Shanxi Datuhe Coke & Chemicals Co., Ltd., ("Datuhe") and, in the same notice, granted TMI's deferral request.[3] See Initiation of Antidumping and Countervailing Duty Administrative Reviews, Request for Revocation in Part and Deferral of Administrative Review, 72 Fed. Reg. 35,690 (Dep't Commerce June 29, 2007). However, several months later, the Department proceeded to initiate administrative

---

[1] Further citations to the Tariff Act of 1930 are to the relevant provisions of Title 19 U.S.C. Similarly, citations to the U.S.C. or C.F.R. are to the 2006 editions.

[2] Citations to the public record are designated "PR" and the confidential record "CR."

[3] Datuhe is not a party to this action.

review with respect to TMI. See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part, 73 Fed. Reg. 4,829 (Dep't Commerce Jan. 28, 2008).[4] On June 9, 2008, the Department published its preliminary determination. See Pure Magnesium from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, 73 Fed. Reg. 32,549 (Dep't Commerce June 9, 2008) ("Preliminary Results"). Later that year, Commerce issued the Final Results, incorporating by reference an internal issues and decisions memorandum ("Decision Mem."). See PR 119.

This consolidated action ensued. In the meantime, Defendant sought leave of the Court to purportedly correct ministerial errors affecting TMI's dumping margin, which was denied because of the Department's failure to adequately prove that the corrections it intended to effect were in fact "ministerial". Notwithstanding USM's June 4, 2009, motion for the Court's reconsideration, the Court conclusively determined that the Department's acts the Final Results were intentional.

## JURISDICTION & STANDARD OF REVIEW

The Court exercises jurisdiction under 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(B)(iii). The Court will uphold Commerce's determination unless "unsupported by substantial evidence on the record, or otherwise not in accordance with law." § 1516a(b)(1)(B)(i). This standard requires that Commerce thoroughly examine the record and "articulate a satisfactory explanation for its action including a

---

[4] TMI sought to enjoin administrative review of its entries, invoking the CIT's residual jurisdiction under 28 U.S.C. § 1581(i). This Court denied TMI's claims as unripe for judicial review. See Tianjin Magnesium Int'l Co., v. United States, 32 CIT    , 533 F.Supp. 2d 1327 (2008).

rational connection between the facts found and the choice made." <u>Motor Vehicle Mfrs. Ass'n of the U.S., Inc., v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed. 2d 443 (1983) (internal quotation omitted). Substantial evidence is "more than a mere scintilla." <u>Consol. Edison Co. v. Nat'l Labor Relations Bd.</u>, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). It means "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Longkou Haimeng Mach. Co. v. United States</u>, 33 CIT , ; 617 F.Supp. 2d 1363, 1366 (2009) (<u>quoting</u> <u>Huaiyin Foreign Trade Corp. (30) v. United States</u>, 322 F.3d 1369, 1374 (Fed. Cir. 2003)).

## DISCUSSION

### A.    Initiation of Administrative Review

In accordance with 19 C.F.R. § 351.213(c),[5] TMI requested a one year postponement of its administrative review, serving its deferral request on the Department and on USM's legal counsel of the previous review, King & Spalding, LLP. <u>See</u> PR 3. Commerce granted TMI's deferral request, noting that it received no timely objections. <u>See</u> 72 Fed. Reg. at 35,690, 92. However, shortly thereafter, ECS wrote a letter protesting the fact that it was not served with TMI's deferral request and asking Commerce to permit an objection out of time. <u>See</u> PR 6. Once the

---

[5] Section 351.213(c) provides:
The Secretary may defer the initiation of an administrative review, in whole or in part, for one year if:
(i)    The request for administrative review is accompanied by a request that the Secretary defer the review, in whole or in part; and
(ii)   None of the following persons objects to the deferral: the exporter or producer for which deferral is requested, an importer of subject merchandise of that exporter or producer, a domestic interested party and, in a countervailing duty proceeding, the foreign government.

objection was filed, Commerce granted ECS the extension and initiated review of TMI, effectively rescinding its previous postponement of TMI's administrative review. See PR 17; Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request For Revocation in Part, 72 Fed. Reg. 4,829 (Dep't Commerce Jan. 28, 2008).

TMI urges that it satisfied the regulatory directive to serve the deferral request "on the petitioner"[6] when it completed service on King & Spalding. Plaintiff further maintains that serving ECS would have been improper since ECS engaged in the unauthorized practice of law by filing documents containing legal arguments before Commerce. See TMI's Br. at 15. Additionally, TMI was aware that King & Spalding was USM's counsel in the previous administrative review. Since communication through a party's attorney is mandated when a licensed attorney knows that the other party is represented by counsel, TMI claims that serving ECS would have risked an ethical breach. See id. at 14 19. TMI also stresses that Commerce's regulations do not require service on more than one representative of the petitioner, nor had the Department issued a service list at that time. See id. at 14. Further, Plaintiff avers that it had "no certain knowledge" that USM had any other representative. Id.

Lastly, TMI maintains that it was reasonably entitled to rely on Commerce's original determination, duly published in the Federal Register. Prior to revoking that deferral, claims Plaintiff, the Department was obligated to provide notice and an opportunity to comment,

---

[6] A party requesting administrative review "must serve a copy of the request . . . on each exporter or producer specified in the request and on the petitioner by the end of the anniversary month or within ten days of filing the request for review, whichever is later." 19 C.F.R. § 351.303(f)(3)(ii).

without which TMI was unduly burdened and deprived of its due process rights. See id. at 21. Considering the sheer volume of information that had to be processed within the constraints of the statute of limitations, TMI asserts that it was unprepared to participate in an administrative review, thus suffering substantial injury. See id. at 20 25.

While TMI's claims may be valid, they are rendered moot. 28 U.S.C. § 2637(d) provides that "the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies." By failing to raise this issue at the administrative level TMI has foreclosed an avenue of possible relief and precluded review at this forum. Although the decision to apply exhaustion principles in trade cases is not mandatory, this Court "generally takes a strict view of the requirement that parties exhaust their administrative remedies before the Department of Commerce in trade cases." Corus Staal BV v. United States, 502 F.3d 1370, 1379 (Fed. Cir. 2007); See also Norsk Hydro Can., Inc. v. United States, 472 F.3d 1347, 1356 n.17 (Fed. Cir. 2006). Commerce's regulations augment the guidance of the pertinent statute and case law, unequivocally requiring TMI to raise these arguments administratively. See 19 C.F.R. § 351.309(c)(2) ("[t]he case brief must present all arguments that continue in the submitter's view to be relevant to the Secretary's final determination . . . including any arguments presented before the date of publication of the preliminary determination").

TMI does not dispute that it failed to raise this issue to the agency. Rather, TMI contends that its claim fell outside the parameters of section 351.309(c)(2). Since the administrative review was already initiated, TMI reasons that its deferral request was irrelevant to the

Department's final determination of the antidumping duty rate. See TMI's Reply at 9. Plaintiff states "it is clear that Commerce had made a decision granting an extension of time and rescinded the deferral, which matter could not be remedied administratively" and "[t]he facts of the record make it clear that Commerce would not change its position in the final results as the review had, in fact, already been conducted." Id. at 7.

Futility is indeed an exception to the exhaustion doctrine. See Gerber Food (Yunnan) Co. v. United States, 33 CIT   ,   , 601 F.Supp. 2d 1370, 1381 (2009). This exception, however, is a narrow one. An inadequate administrative remedy is where the agency is incapable of providing relief. See Statistical Phone Philly v. NYNEX Corp., 116 F.Supp. 2d 468, 480 (2000). The mere fact that an adverse decision may have been likely does not excuse a party from satisfying statutory or regulatory requirements to exhaust administrative remedies. See Commc'ns Workers of Am. v. Am. Tel. & Tel. Co., 40 F.3d 426, 433 (D.C.Cir. 1994).

Plaintiff's argument is not compelling. TMI fails to cite authority for the proposition that Commerce cannot overrule its own decision, once made. Plaintiff assumed that raising its contentions to Commerce would have been pointless, however it is not plainly obvious that the Department would not have been amenable to TMI's deferral request claims. It is also inconsistent for Plaintiff to assert that invoking this issue before the Department would have been irrelevant to Commerce's final determination and then proceed to petition this Court to invalidate these same Final Results. The fact that Commerce was the agency that initiated TMI's administrative review supports addressing related arguments

directly to the decision making body. Lastly, TMI deprived Commerce an opportunity to reconsider the matter and state the reasoning for its determination. See Unemployment Comp. Comm'n of Alaska v. Aragon, 329 U.S. 143, 155, 67 S.Ct. 245, 91 L.Ed. 136 (1946); See also Gerber Food, 601 F.Supp. 2d at 1379. The Department could have set forth its position in a detailed manner that would facilitate judicial review. As a result, the Court is placed in the position of expending judicial resources for a dispute that might have been resolved earlier.

It would not have been futile for Plaintiff to have raised its claim regarding deferral of administrative review to Commerce. Plaintiff did not exhaust its administrative remedies nor does an exception apply on these facts. In an antidumping case, where "'Congress has prescribed a clear, step by step process for a claimant to follow, . . . the failure to do so precludes [the claimant] from obtaining review of that issue in the Court of International Trade.'" Ta Chen Stainless Steel Pipe, Ltd. v. United States, 28 CIT 627, 645, 342 F.Supp. 2d 1191, 1206 (2004) (quoting JCM, Ltd. v. United States, 210 F.3d 1357, 1359 (Fed. Cir. 2000)). Accordingly, the Court is precluded from substantively addressing TMI's claim that Commerce erroneously initiated administrative review.

**B. Calculation of Normal Value**

Ordinarily, normal value is the price at which the subject merchandise is sold in the exporting country. However, nations operating under non market economy ("NME") principles invalidate the Department's normal methodologies for price comparisons because of governmental control. See Preliminary Results at 32,553. Thus, Commerce constructs

surrogate values from the factors of production that go into producing the merchandise and then extrapolates normal value from that information. See 19 U.S.C. §§ 1677b(c)(1)(B), (3); <u>Dorbest Ltd. v. United States</u>, 30 CIT 1671, 1678, 462 F.Supp. 2d 1262, 1268 (2006).

Valuation of the factors of production must be based "on the best available information" of values prevailing in a surrogate country that the Department finds is both economically comparable to the NME country in question and a significant producer of the merchandise in question. <u>See</u> §§ 1677b(c)(1), (4); <u>See</u> <u>also</u> <u>Dorbest</u>, 30 CIT at 1675 ("[t]he term 'best available' is one of comparison, i.e., the statute requires Commerce to select, from the information before it, the best data for calculating an accurate dumping margin"). Commerce's regulations specify that it normally uses publicly available information. See § 351.408(c)(4). Beyond this preference, the Department's general practice is to consider the quality, specificity, and contemporaneity of the financial statement, as well as whether its overall experience is representative of the respondent's operation. See Dorbest, 30 CIT at 1716.

Since PRC was determined by Commerce to be a NME, the Department chose India as the surrogate country. See Final Results at 76,337. Thus, Commerce's task was to assess the "prices or costs" for the factors of production of pure magnesium in India in an attempt to construct a hypothetical market value of that product in the PRC. See Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1377 78 (Fed. Cir. 1999).

### 1. Valuation of Dolomite

Commerce determined that it would base the surrogate values, in

general, on contemporaneous import data from the World Trade Atlas® ("WTA").[7] See Preliminary Results at 32,554. Despite that decision, the Department concluded that the WTA was not the best available information to value dolomite, a raw material consumed in the production of the subject merchandise. This determination was based on its finding that "internationally traded dolomite is likely to be a different quality product than the dolomite used for magnesium production." Decision Mem. at cmt. 1. Specifically, Commerce concluded that "internationally traded dolomite is likely to be [a] high end high quality product."[8] Id. Accordingly, Commerce based the surrogate value on the average purchase price of dolomite reflected in the financial statements of two domestic Indian companies. See id.

Commerce reached its decision, in part, on the preceding administrative review's finding that the volume of dolomite imports is minuscule compared to Indian domestic production, in addition to the finding that the WTA data represents a very small quantity compared to other values on record in that proceeding. See Pure Magnesium from the People's Republic of China: Final Results of 2004 2005 Antidumping Duty

---

[7] The WTA is an online database tracking globally traded commodities. It enables users to determine the value of a specific product and identify countries that the product is being imported from or exported to using all levels of the HTS. See http://www.gtis.com/english/GTIS WTA.html (last visited Aug. 9, 2010).

[8] Commerce reasoned that (1) dolomite is generally a low-value high-bulk commodity, which does not normally lend itself to long transport; (2) dolomite that is traded internationally is likely to be in the high-end value-added range; (3) the WTA data set represents internationally traded dolomite values; therefore (4) the WTA primarily represents high-end, value-added dolomite; (5) TMI's dolomite is a high-bulk low-value commodity product; thus (6) the type of dolomite used by TMI is unlikely to be shipped internationally; and (7) the WTA data set is unlikely to be representative of TMI's dolomite. See Decision Mem. at cmt. 1.

Administrative Review, 71 Fed. Reg. 61,019 (Dep't Commerce Oct. 17, 2006), Issues & Decision Memorandum at cmt. 1 ("2004 2005 Review"). USM asserts that the Department's reliance on the 2004 2005 Review are misguided since circumstances of this review differ significantly. See USM's Br. at 22. First, Defendant Intervenor contends that there has been a substantial increase in trade volume. USM specifically points to the fact that dolomite imports during the 2004 2005 Review were only 53 Metric Tons ("MT") whereas the volume of imports during the POR totaled 12,603 MT. See id. at 24, 26. This larger quantity of traded dolomite is more representative of all types of dolomite and suggests that the WTA may include some low value dolomite. See id. at 24 25, 28. Additionally, USM claims that this data undermines the Department's overall conclusion that dolomite is not frequently traded on the international market.

Commerce has an obligation to evaluate the relative accuracy of domestic and import data in valuing factors of production. See Yantai Oriental Juice Co. v. United States, 26 CIT 605, 617 (2002). Commerce specifically addressed USM's claims, stating that a "significant increase in the trade volume since the previous review period fail to rebut the conclusion that we again derive from the [evidence]." Decision Mem. at cmt. 1. Despite an increase in volume, Commerce reasonably determined that generally low import statistics of dolomite indicate that India's requirements are satisfied domestically. Moreover, the Department found TMI's dolomite consumption ratio to be approximately the same as during the 2004 2005 Review, "indicating that TMI continued to use low value high bulk dolomite to produce pure magnesium." Id. These conclusions

comport with court precedent establishing that using import data to value factors of production may not be reasonable when it is unlikely that the domestic industry would use imports and where domestic data is available. Dorbest, 30 CIT at 1688 89.

Defendant Intervenor attempts to utilize values from the Infodrive data on the record to corroborate the WTA and establish that it includes low value product. USM asserts that the dolomite, which TMI described as "crude uncalcined dolomite block," is classified under 2518.1000, HTS, as "dolomite not calcined or sintered." See USM's Br. at 24. According to USM, the Infodrive data further identifies 2518.1000 as "Dolomite Block(s)" or "Dolomite in Bulk," thus supporting the imports as consisting of crude, unprocessed dolomite. See USM's Br. at 25. Therefore, Defendant Intervenor infers, contrary to the Department's conclusion, that some of the dolomite shipped internationally in blocks or bulk are comprised of low value.

However, with regard to this argument, Commerce found that "Petitioner has not put forth any evidence to support its contention that dolomite shipped in 'bulk' or 'blocks' internationally are of high bulk, low value commodity product." Decision Mem. at cmt. 1. Although this Court has held that Infodrive India data can be "illuminating as to the nature of the product" being valued within a specific tariff subheading, Dorbest, 30 CIT at 1698, the Department specifically stated that:

> We examined the Infodrive data on the record and found that the Infodrive data only describes the physical characteristics of the imported dolomite as "dolomite in bulk" and "dolomite blocks", and there is no record evidence to conclude that dolomite shipped in "bulk" or "blocks" is a low value commodity. Thus, we are not pursuaded [sic] that the data from Infodrive establishes that the shipments in the WTA data are of low value commodity product.

Decision Mem. at cmt. 1. Therefore, Commerce found that USM's argument fell short of establishing the necessary link that dolomite shipped in bulk is a low value commodity, thus represented adequately by the WTA data. The weight that the Department should afford the Infodrive data is a factual question, which is most appropriate for the technical expertise of the Department. See Dorbest, 30 CIT at 1676. The Court defers to the determination of the Department as the "master of antidumping law." Thai Pineapple Pub. Co. v. United States, 187 F.3d 1362, 1365 (Fed. Cir. 1999).

Finally, USM asserts that the Department deviated from its general preference to use WTA data. See USM's Br. at 23. Defendant Intervenor seems to conclude that since the WTA import data generally satisfies Commerce's established preferences governing the selection of data sources, it follows that the Department prefers to use it, unless the WTA data is unreliable or distorted. See id. USM relies on Dorbest, in which the Department rejected WTA data as the best available information opting instead to use Monthly Statistics of Foreign Trade in India, which was publicly available, contemporaneous and had been used in previous investigations but also included all Indian imports. Dorbest, 30 CIT at 1687. USM interprets Dorbest as illustrating Commerce's preference in situations where it is faced with a choice between using data that fails to capture all of the inputs used by the NME producer and between data that broadly comprises all of the producer's inputs but includes some inapplicable data, the Department will choose the overinclusive data. See USM's Br. at 23 (citing Dorbest, 30 CIT at 1687).

It may be true that Commerce's practice is to use WTA data when

selecting among import data sources. However, when the Department has a choice between domestic data and import statistics, Commerce's preference is to use domestic data. <u>See</u> <u>generally</u> <u>Hebei Metals & Minerals Imp. & Exp. Corp. v. United States</u>, 29 CIT 288, 299, 366 F.Supp. 2d 1264, 1273 (2005) ("A domestic price is preferred for the calculation of surrogate values by prior practice, policy, and logic"); <u>Rhodia Inc. v. United States</u>, 25 CIT 1278, 1287, 185 F.Supp. 2d 1343, 1352 (2001) ("Commerce has a stated preference for the use of the domestic price over the import price, all else being equal"). Further, a mere preference can never overcome Commerce's paramount obligation under the statute to use the best available information to calculate dumping margins as accurately as possible. <u>See</u> <u>Rhone Poulenc, Inc. v. United States</u>, 899 F.2d 1185, 1191 (Fed. Cir. 1990). A surrogate value must be "as representative of the situation in the NME country as is feasible." Nation Ford Chem. Co. v. United States, 21 CIT 1371, 1375, 985 F.Supp. 133, 137 (1997).

Here, the Department attempted to capture TMI's experience by carefully considering the particular facts of the industry and made a reasoned determination that the WTA data did not represent the best information based on its conclusion that TMI's dolomite is not traded internationally. Commerce examined trade publications in order to determine the type of dolomite traded internationally; analyzed the prices paid by Indian producers for dolomite compared with the dolomite average unit value in the WTA data; employed Infodrive data at USM's request to further clarify the dolomite included in the WTA data set; and compared consumption levels for TMI from the prior period of review against the POR at issue. Additionally, the Department considered its

prior precedent.  None of this is contrary to any preference for WTA data by Commerce.  The Court also notes that  Defendant Intervenor complains of the Department's failure to use WTA data without affirmatively alleging that there are flaws in the domestic financial statement employed or demonstrating that the WTA data will provide a more accurate picture, comparatively speaking.  Commerce persuasively rejected USM's contentions.

The Court's role is not to "evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." Goldlink Indus. Co. v. United States, 30 CIT 616, 619, 431 F.Supp. 2d 1323, 1326 (2006).  As the finder of fact, the Department had discretion to choose between these data sets and its conclusion does not violate the boundaries set by section 1677b.

### 2.    Valuation of TMI's Magnesium Byproduct

Commerce's practice is to offset the normal value calculation for a respondent whose manufacturing process generates a byproduct that it either sells or reuses in the production of the subject merchandise.  See 19 C.F.R. § 351.401.  The Department ultimately granted such a credit for Plaintiff's byproduct, classifying it under 8104.11, HTS, "Magnesium and articles thereof, including waste and scrap: Unwrought magnesium: Containing at least 99.8 percent by weight of magnesium."[9]  See Final Results at 76,337; PR 121 at attach. 1; PR 122 at attach. I(i).   USM

---

[9] "Unwrought" includes metal, whether or not refined, in the form of ingots, blocks and similar manufactured primary forms but does not cover rolled, cast or sintered forms which have been machined or processed otherwise than by simple trimming, scalping or descaling.  See Section XV, Additional U.S. Note 1, HTS.

challenges this classification, contending instead that TMI's production process generates a low value waste residue that is best classified under 2620.40, HTS, as "Slag, ash and residues (other than from the manufacture of iron or steel), containing arsenic, metals or their compounds: Containing mainly aluminum." Alternatively, USM submits that 8104.20 would have been a more appropriate choice than 8104.11.[10] See USM's Reply at 1 2. Subheading 8104.20, HTS, encompasses "Magnesium and articles thereof, including waste and scrap: Waste and scrap."[11] See PR 82 at attach. 1; PR 84 at attach. 1.

USM posits that different production methods of creating the subject merchandise generate scrap with differing levels of magnesium, consequently affecting their classification. See USM's Br. at 14. During the POR, TMI had [

]. See CR 6 at D 2, D 3. TMI's [

]. See id. at D 3, D 4, Ex. D1 A.

[

---

[10] Despite this Court unequivocally ruling on two occasions that Commerce intentionally valued TMI's magnesium byproduct under subheading 8104.11, HTS, USM insists that the Department made a ministerial error in the Final Results. See USM's Br. at 14 n.17; USM's Reply at 1 n.3. Based on this assumption, USM refers to 8104.20, HTS, as the classification that Commerce "intended to select for this factor." USM's Br. at 14 n.17. The Court again rejects this belabored argument and proceeds to determine whether the Department's valuation of TMI's magnesium byproduct under 8104.11 is in accordance with law and supported by substantial evidence.

[11] The HTS defines "waste and scrap" as the results of the "manufacture or mechanical working of metals, and metal goods definitely not usable as such because of breakage, cutting-up, wear or other reasons." Section XV, Note 8(a), HTS.

]. See PR 34 at D

3. [

]. See CR 6 at D 3; D 4; Ex. D 1A.

TMI's [

]. See CR 6 at D 3, D 4, Exs. D1 B, D 11; CR 4 at 18.

[

]. <u>See</u> USM's Br. at 14 15; CR 6 at D 3; Ex. D 1B. [

]. See CR 12 at 16; CR

6 at D 3; Ex. D 1B. The parties here do not contest that [

].

See PR 122; Decision Mem. at cmt. 3.

The [                                                                                    ]

fail to support the Department's ultimate determination assigning the

same HTS provision "regardless of whether the scrap constituted a

purchased input or by product." PR 121 at 2 3. Commerce stated in its

analysis memorandum of TMI for the Final Results that:

> In the Preliminary Results, we valued magnesium scrap using the Indian WTA data for HTS 8104[.]20. We valued magnesium scrap using HTS 8104[.]20 regardless of whether the scrap constituted a purchased input or by product. However, after the Preliminary Results, both Petitioner and TMI argued that HTS 8104[.]11, unwrought magnesium containing 99.8 percent magnesium, more closely reflects the type of magnesium scrap used in the production of pure magnesium. Thus, we valued magnesium scrap using this HTS number from the WTA for the [POR].

Id. (footnotes omitted). The Department thus determined as a factual matter that the value for TMI's [

].

USM claims that [                    ] byproduct output is a sludge comprised of flux and impurities containing only about ten percent magnesium, unlike the [

]. In support of this assertion, USM submitted expert testimony in two affidavits. See PR 97 at Exs. 1 and 2. The first, Cameron Tissington, USM's Vice President of Sales and Marketing, explains the low market value for magnesium waste byproduct and the specific experience of magnesium producers from the PRC. According to Tissington, [

].

See PR 97 at Ex. 2. Tissington also concludes that the residue created during the pidgeon process has too low a value to be classified under magnesium waste and scrap. See PR 97 at Ex. 2. USM's other affidavit was by Dr. Ramaswami Neelameggham, Technical Development Scientist at USM and a professional metallurgist with over thirty years experience. Dr. Neelameggham does not consider the residue produced by the pidgeon process to be magnesium scrap, "as it contains too little magnesium."

PR 97 at Ex. 1.  Rather, "it is in the nature of a slag."  Id.

USM proffers that 2620.40, HTS is the most appropriate subheading to classify TMI's magnesium byproduct.  According to USM, the propriety of 2620.40, HTS, is supported by Commerce's consistent past finding that aluminum products are comparable to magnesium.  See USM's Br. at 17.  Record evidence establishes that Commerce considered and rejected Heading 2620 with respect to respondent Datuhe's magnesium byproduct, concluding that Heading 8104 was more exact.  Commerce stated, in pertinent part:

> there is no record evidence which indicates that the values for aluminum residue, zinc ash, or brass dross are more specific to magnesium residue than HTS [8104.20.00] which covers "Magnesium Waste and Scrap."  Unlike the values of aluminum residue, zinc ash and brass dross proposed as surrogate values, the value for "Magnesium Waste and Scrap" relates to magnesium and not to a different material.

Decision Mem. at cmt. 8.[12]  Thus, the Department determined that the provisions relating directly to magnesium were generally more specific than those of Heading 2620 and accordingly were the best information available to value Datuhe's magnesium byproduct.  USM contends that [

          ] to produce the subject merchandise, consume the same raw material inputs, and generate the same scrap byproducts.  USM's Br. at 21 22; USM's Reply at 5 6.  However, it is not clear, based on record information, that Datuhe and TMI's [                    ] used the same production process thus the Court cannot utilize the Department's reasoning.

Next, USM asserts that the Harmonized Commodity Description and

---

[12] The Department erroneously referenced 8014.20.00 instead of HTS Subheading 8104.20.00.

Coding System Explanatory Notes ("ENs") precludes classification of TMI's magnesium byproduct under Heading 8104. See USM's Br. at 14 16. EN 81.04 specifically excludes "slag, ash and residues from the manufacture of magnesium (heading 26.20)." Defendant Intervenor asserts that, as a matter of law, Commerce must credit "the unambiguous text of relevant explanatory notes absent persuasive reasons to disregard it" and accordingly classify TMI's magnesium byproduct under 2620.40. USM's Reply at 4.

In contrast to Customs classification cases where determining the proper classification is paramount, antidumping cases involve the HTS merely to approximate the cost of a factor of production. See Dorbest, 30 CIT at 1725. Further, it has been established that ENs are only persuasive and not binding authority. See, e.g., Mita Copystar Am. v. United States, 21 F.3d 1079, 1082 (Fed. Cir. 1994); Michael Simon Design, Inc. v. United States, 501 F.3d 1303, 1307 (Fed. Cir. 2007). On the other hand, it is well settled that "substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Hynix Semiconductor Inc. v. United States, 29 CIT 995, 999, 391 F.Supp. 2d 1337, 1342 (2005) (internal quotation omitted). Commerce's analysis does not address USM's arguments regarding the ENs, yet an examination of the ENs accompanying the subheadings appear to support Defendant Intervenor's argument. Furthermore, such an analysis would buttress Commerce's statutory duty to use the best available information.

The antidumping statute does not prescribe a method for calculating byproduct offsets instead leaving the decision to the technical expertise of the Department. Commerce's goal is to "acquire an accurate reading

of the actual costs of a company operating in a state controlled economy." Tehnoimportexport v. United States, 15 CIT 250, 254, 766 F.Supp. 1169, 1174 (1991). Thus, the Department is prevented from using information that may cause inaccuracies or distortions. In reviewing the record and arguments for both sides, the Court finds that the administrative record does not support such a high value for the magnesium byproduct at issue. For the Department, the decision not to differentiate between the magnesium input and byproduct was not reasonable because it did not first establish an adequate connection between them. The Department assumed, rather than demonstrated that the input and byproduct were identical. In the absence of such a finding, Commerce has no basis to conclude that Heading 8104 constituted the best available information on the record. This issue is accordingly remanded to the Department in order for it to further explain its reasoning. Commerce failed to adequately explain its decision to value the magnesium byproduct at issue here under HTS classification 8104.11, as unwrought magnesium containing at least 99.8% by weight. In light of the above analysis, the Court holds that Commerce's findings were not reached by reasoned decision making supported by a stated connection between the facts found and the choice made.

### 3.   Surrogate Financial Ratios

To capture indirect costs and recreate the full experience of the respondent, section 1677b(c)(1) directs Commerce to supplement the factors of production with "an amount for general expenses and profit plus . . . other expenses." The value that Commerce assigns to these indirect costs is known as the surrogate financial ratios, which, put

simply, reflect a percentage of overhead; selling, general and administrative expenses ("SG&A"); and profit expenses. See Dorbest, 30 CIT at 1715 16 n.36.

Prior to the Preliminary Results, the parties submitted financial statements of four companies, including aluminum producers Madras Aluminum Co. Ltd. ("Malco"), Hindalco Industries Ltd. ("Hindalco"), National Aluminum Co. Ltd. ("Nalco"), and Sterlite Industries (India) Ltd. ("Sterlite"). See Preliminary Results at 32,555. Before the Final Results, an additional twelve were placed on the record, including Hindustan Zinc, Ltd., ("Hindustan"). See Decision Mem. at cmt. 6. Commerce evaluated all sixteen statements but ultimately determined that Malco's financial statement constituted the best available information upon which to base the financial ratios because it found that Malco is profitable, has contemporaneous data, does not use countervailable subsidy programs, and produces a comparable product. See id. at cmt. 6(B).

Commerce rejected the financial statement of zinc producer Hindustan although it has also previously held zinc to be comparable to magnesium.[13] However, this finding was not the sole support for the Department's conclusion since the Department "still would not use the [zinc financial statements] for [various] reasons." See Decision Mem. at cmt. 6(E). In the case of Hindustan, the Department disfavored the fact that its financial statement reported no raw material consumption. See id. USM counters that, logically speaking, it is impossible to produce primary

---

[13] TMI agrees that Commerce correctly rejected Hindustan on the alternate ground that Hindustan is related to Sterlite, who received countervailable subsidies. See TMI's Resp. at 25.

zinc without consuming any raw materials and Hindustan's raw material costs are included within its reported mining expenses. This is because Hindustan mines, rather than purchases, the raw material inputs used in its manufacture of zinc. See USM's Br. at 35. Thus, according to USM, Hindustan's financial statement, read closely, does not contain the flaws alleged by Commerce.

USM further contends that Commerce contradicts Wuhan Bee Healthy Co. v. United States, 31 CIT 1182 (2007), by eliminating Hindustan's financial statement while accepting Malco's. See USM's Reply at 12 13. In Wuhan Bee Healthy, a surrogate producer bought raw honey from members of its cooperative before processing and selling the product. Although zero was listed in the surrogate producer's financial statement, Commerce went beyond the reported line item to formulate a raw material cost. Defendant Intervenor finds Commerce's decision arbitrary because of the Department's willingness to construct a line item in Wuhan Bee Healthy yet was unwilling to do so for Hindustan. See id.

USM becomes more frustrated given Commerce's inconsistent treatment of integrated operations. Malco generates some of its own energy, which in turn caused its financial statement to reflect lower costs. USM asserts that nothing distinguishes Hindustan's mining of raw materials from Malco's report of energy generation: the financial statement of both companies reflect integrated operations. See USM's Br. at 36. As such, USM maintains that Commerce's elimination of Hindustan was discordant with Commerce's acceptance of Malco's financial statement.

The Court disagrees. The Department properly used its standard methodology to consider both the line item of raw material cost and

integrated operations. Since Hindustan's financial statement "did not otherwise explain how it accounted for its direct material consumption," Commerce could not assess the "validity of its material consumption during the POR." Decision Mem. at cmt. 6(E). The fact that Hindustan mines, rather than purchases, raw materials does not fully explain why Hindustan listed zero consumption. It would be unreasonable for Commerce to construct a value for Hindustan's raw material consumption. Moreover, in direct contrast to Defendant Intervenor's assertion, the very cases that USM cite affirm the Department's practice to accept financial statement information on an "as is" basis. On its face, Hindustan's financial statement reported zero whereas Malco's statement contained a value, albeit a below market rate. "In situations in which a statute does not compel a single understanding . . . 'our duty is not to weigh the wisdom of, or to resolve any struggle between, competing views of the public interest, but rather to respect legitimate policy choices made by the agency in interpreting and applying the statute.'" Lasko Metal Prods., Inc. v. United States, 43 F.3d 1442, 1446 (Fed. Cir. 1994) (citing Suramerica de Aleaciones Laminadas, C.A. v. United States, 966 F.2d 660, 665 (Fed. Cir. 1992)). Commerce was consistent in its policy not to deconstruct financial statements.

However, the Court reaches a different conclusion with respect to the Department's analysis of the Malco financial statement. Malco's statement had just a nine month closing rather than the usual twelve month period. See USM's Br. at 30. USM asserts that using an abbreviated closing period is inherently unreliable and a full year of data would be most representative of a company's full production

experience. See USM's Reply at 13 14. Defendant Intervenor cites to both agency rulings and Court decisions acknowledging a preference to use a full year of operations, which the Department subsequently counters by arguing that each case acknowledges Commerce's deviation from standard practice would be reasonable where the evidence compels such a determination.[14] See USM's Br. at 30 31; Def's Resp. at 25.

The sole exception of Commerce employing a financial statement covering less than a year involved the same nine month Malco statement at issue in this case. See Magnesium Metal from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 73 Fed. Reg. 40,293 (Dep't Commerce July 14, 2008). Otherwise, no other precedent demonstrates that a nine month period is adequate. Although the Department does not have an explicit preference to use a full year of financial statements, it has certainly been its practice. See Furfuryl Alcohol, 60 Fed. Reg. at 22,560 61 ("[T]he Department generally looks to a full year period in computing [SG&A expenses for costs of production and constructed value]"). Commerce must apply its criteria in a consistent and uniform manner, otherwise its selection could become arbitrary and capricious. See Dorbest, 30 CIT at 1716.

---

[14] See Final Determination of Sales at Less Than Fair Value: Furfuryl Alcohol From Thailand, 60 Fed. Reg. 22,557, 22,560 (Dep't Commerce May 8, 1995) ("Furfuryl Alcohol") (the respondent failed to demonstrate why it should deviate from its normal practice of using annual financial data where the respondent attempted to report SG&A based on a six months instead of a twelve month period); Bethlehem Steel Corp. v. United States, 24 CIT 375, 383 (2000) (Commerce had discretion to use two years of financial statements where the POR covered substantially more than one year); Stainless Steel Sheet and Strip in Coils from Mexico; Final Results of Antidumping Duty Administrative Review, 74 Fed. Reg. 6,365 (Dep't Commerce Feb. 9, 2009), Issues & Decision Memorandum at cmt. 5 ("In certain instances, an unusual fact pattern may present itself where it may be appropriate to deviate from the Department's normal practice").

USM points to several indications of possible distortion in Malco's financial statement. First, Malco experiences erratic production levels throughout the year for its products. For example, Malco's aluminum ingot production was over four hundred percent greater than the prior twelve month period. See USM's Br. at 32. Further, Malco commissioned a dry scrubbing unit during the nine month period, causing a disruption in production operations that may have affected its profits. See id. at 33. Finally, the cost of raw materials tend to fluctuate, and many expenses, such as insurance and bonus payments, are incurred sporadically throughout the fiscal year. For example, the management salaries in Malco's truncated statement were only half of the amount incurred in the prior twelve month period. See id.

Commerce determined that the nine month closing remedied any irregularities because Malco made "year end adjustments," specifically intended to address such distortions. Commerce explicitly reasoned:

> [W]e disagree with Petitioner's argument that MALCO's financial statements are incomplete. According to the information on page 55 of MALCO's audited financial statements, MALCO changed its accounting year from July to June to April to March in fiscal year 2007 2008. Therefore, MALCO's 2006 2007 fiscal year included the nine month period of July 2006 to March 2007, after which MALCO had a nine month closing. As a result, these audited financial statements include all the appropriate year end adjustments even though they cover a nine month period. Therefore, we are satisfied that MALCO's financial statements are complete.

Decision Mem. at cmt. 6(B).[15] However, such "year end adjustments" do

---

[15] Commerce cites Malco's financial statement to support this conclusion. See Decision Mem. at cmt. 6(B). However, the page Commerce refers to merely states the financial quarter results, publication dates and annual accounts, and states that "[Malco] has changed its accounting year from July-June to April-March from the financial year 2007-08 and hence for the present financial year 2006-07, the Company will have nine months' closing." PR 64 at Ex. 10.

not sufficiently address distortions, nor do they account for events that occurred during the missing three month period. See USM's Reply at 13. USM asserts that "year end adjustments" are a means for accountants to identify and match revenues and expenses for the period incurred and to determine a company's assets and liabilities on a specific date. See id. Malco's financial statement itself, in the Notes on Accounts section, specifically states that, due to the nine month closing, "the figures are not comparable with those of the previous year." PR 64 at Ex. 10. Commerce "cannot use a surrogate value if it is also distorted, otherwise defeating the purpose of using a surrogate value rather than the actual export value." Goldlink Indus., 30 CIT at 629.

Commerce's conclusion that Malco's audited financial statement reflects all the appropriate year end adjustments is speculative. The Department makes a leap in logic of why adjusting the fiscal year dates from July to June and April to March, causing an abbreviated accounting year of nine months, <u>resulted in</u> the appropriate year end adjustments. A declaration that accounting year 2006 2007 was considered closed after nine months does not indicate that it was a representative sample of the sporadic costs that emerge during different times of a fiscal year. Nowhere does Commerce suggest that, for accounting purposes, a fiscal year can be less than a typical twelve month annual time period.

Considering Malco's allegedly flawed financial statements, Commerce's rejection of aluminum producers Nalco and Hindalco as surrogates is equally confounding to USM. See USM's Br. at 33 34. Commerce eliminated these financial statements due to its policy not to "rely on financial statements where there is evidence that the company

received countervailable subsidies" and there exists "other sufficient reliable and representative data on the record for purposes of calculating the surrogate financial ratios." Decision Mem. at cmt. 6(C). Although the Department has repeatedly held that financial statements of a company that is receiving subsidies does not constitute the best available information, when the circumstances warrant, Commerce has employed financial statements exhibiting receipt of subsidies. See id. In such situations, Commerce "must explain its determination that [the] financial ratios are not distorted by the subsidies it received." Goldlink Indus., 30 CIT at 629. The subsidization of the two producers was de minimis yet they were only afforded brief consideration because of Malco. See Oral Arg. Tr. at 31.

The Court acknowledges that its review is limited to sustaining Commerce if one could reasonably conclude that Commerce chose the best available information, even if the Court would have chosen other data. However, there is no clear indication that Malco's flawed financial statement is significantly better than the rejected surrogates. Commerce failed to meet its obligation to satisfactorily explain its decision. c Thus, based on the arguments provided here, a reasonable mind would be unable to conclude that the Department chose the best available information and that Commerce's decision was supported by substantial evidence. The Court remands this issue to Commerce to further explain its determination in detail. In light of this remand to Commerce regarding the surrogate financial statements used to derive the financial ratios, the Court reserves judgment regarding subsidiary aspects of Commerce's calculation of the financial ratios since the Department's re

examination of the financial statements may affect this outcome.

## C.    Combination Rate

Since country wide cash deposit rates in NMEs can vary considerably from separate company rates, Commerce attempted to prevent circumvention of high cash deposit rates by firms diverting exports through intermediaries with lower rates.  A combination rate involves specific pairs of exporters and producers in situations where a specific producer supplied the merchandise which was then exported by the firm in question during the POR.  See 19 C.F.R. § 351.107(c).  TMI was assessed a separate cash deposit rate of 0.63%, a significant difference from the country wide PRC rate of 108.26%.  See Final Results at 76,337.

USM contends that Commerce should have assigned a combination cash deposit rate for these circumstances because [


], an action termed "funneling."[16]

USM claims that [

] created the need for a combination cash deposit rate.  See USM's Br. at 37.

Commerce generally refrains from issuing combination rates for administrative reviews.  See Decision Mem. at cmt. 10.  The preamble to the Department's regulations expresses that "if sales to the United States are made through an NME trading company, we assign a non

---

[16] See CR 13 at Ex. 1 [
].

combination rate to the trading company." Id. Further, the Department has discretion in administering combination rates. See § 351.107(b) ("the Secretary may establish a 'combination' cash deposit rate" (emphasis added)).

USM cites to Final Results of Antidumping Duty Administrative Review: Certain In Shell Raw Pistachios From Iran, 70 Fed. Reg. 7,470 (Dep't Commerce Feb. 14, 2005) ("Pistachios From Iran"), the sole example where Commerce issued a combination rate in an administrative review. However, Commerce explicitly distinguishes Pistachios From Iran and the facts of the case at bar. First, the exporter in Pistachios From Iran sold its product exclusively to the United States whereas no record evidence establishes that Plaintiff does so. See Decision Mem. at cmt. 10. Second, TMI "is a well established exporter that has participated in previous reviews" unlike the exporter in Pistachios From Iran, who, was participating in a new shipper review. Id. These departures were significant enough in the eyes of the Department to forego a combination rate.

USM submits that the Department's limited use of combination rates is arbitrary, since no clear rationale distinguishes Commerce's refusal to employ them during administrative reviews as opposed to new shipper reviews. See USM's Reply 14 15. However, Commerce has published a policy bulletin regarding combination rates in new shipper reviews, as well as one for combination rates in new antidumping investigations. See Policy Bulletin 03.2 (Dep't Commerce Mar. 4, 2003); Policy Bulletin 05.1 (Dep't Commerce Apr. 5, 2005). The Department's policy is paramount because no law has been established directly addressing the procedure for

issuing combination rates or limiting the agency's power.  Commerce has broad discretion to determine when and how to administer combination rates.  See US Magnesium, LLC v. United States, 31 CIT 988, 992 (2007).  We must defer to Commerce's interpretation "based upon the recognition that 'Commerce's special expertise in administering the antidumping law entitles its decisions to deference from the courts.'"  Allegheny Ludlum Corp. v. United States, 27 CIT 1034, 1040, 276 F.Supp. 2d 1344, 1350 (2003) (citing Ta Chen Stainless Steel Pipe Inc. v. United States, 298 F.3d 1330, 1335 (Fed. Cir. 2002)).

USM requests a preemptive measure on the chance an antidumping violation will be committed, based solely on hearsay at this point in time.  The only indication substantiating USM's argument is [


].  While it is clear that [

], no evidence of actual funneling exists on the record.  Unfortunately for USM, the Court's review of Commerce's determination is limited to the record of the underlying proceeding.  See §§ 1516a(a)(2)(B)(iii), (b)(2)(A).

The Court cannot force Commerce to alter its combination rate policy for administrative reviews.  Even if the Department were to broaden its application of combination rates in the future, the matter remains solely in the discretion of Commerce.  See US Magnesium, 31 CIT at 992; see also Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55, 65, 124 S.Ct. 2373, 159 L.Ed. 2d 137 (2004) (holding that an agency can be compelled to act but a court cannot dictate what that action must be).  The Court will not strong arm Commerce into rendering a premature decision, nor

does it have the authority to declare agency policy.

In addition to its established practice of not administering combination rates, Commerce consistently applied its prior rulings as a benchmark to deem the combination rate unnecessary under these circumstances. See Decision Mem. at cmt. 10. Therefore, Commerce acted well within its authority. While particular circumstances may create the need for a combination rate, this discretion is completely within the purview of Commerce and is evaluated on a case by case basis. See Tung Mung Dev. Co. v. United States, 26 CIT 969, 979, 219 F.Supp. 2d 1333, 1343 (2002).

The Court holds that Commerce acted within its authority when it did not issue a combination rate for TMI. USM has failed to prove that Commerce did not act in accordance with law and substantial evidence. Thus, the Court dismisses Defendant Intervenor's motion on this issue.

**CONCLUSION**

For the foregoing reasons, Commerce's final results of antidumping administrative review for pure magnesium from the PRC is affirmed in part and remanded in part.

/s/ Nicholas Tsoucalas
**NICHOLAS TSOUCALAS**
**SENIOR JUDGE**

**Dated:     August 9, 2010**
**           New York, New York**